J. Robert Forshey
State Bar No. 07264200
Jeff P. Prostok
State Bar No. 16352500
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
bforshey@forsheyprostok.com
jprostok@forsheyprostok.com

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| MAJESTIC LIQUOR STORES, INC., | ) | Case No. 10-43849-rfn-11 |
| MAJESTIC TEXAS PROPERTIES, L.P., | ) | Case No. 10-43850-dml-11 |
| MAJESTIC TEXAS-GRAPEVINE, L.P., | ) | Case No. 10-43851-dml-11 |
| MAJESTIC GP, LLC, | ) | Case No. 10-43852-rfn-11 |
| MAJESTIC GP II, LLC, | ) | Case No. 10-43853-dml-11 |
| | ) | |
| Debtors. | ) | **Motion for Joint** |
| | ) | **Administration Pending** |
| | ) | |
| | ) | **Emergency Hearing Requested** |

**EXPEDITED MOTION FOR THE USE OF CASH COLLATERAL AND TO
PROVIDE ADEQUATE PROTECTION TO SECURED LENDER**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Majestic Liquor Stores, Inc. ("Majestic"), Majestic Texas Properties, L.P. ("Majestic Properties"), Majestic Texas-Grapevine, L.P. ("Majestic Grapevine"), Majestic GP, LLC ("Majestic GP"), and Majestic GP II, LLC ("Majestic GP II," and collectively, the "Debtors"), as debtors in possession, file this Expedited Motion for the Use of Cash Collateral and to Provide Adequate Protection to Secured Lender (the "Motion"), and respectfully represent as follows:

**I. JURISDICTION AND VENUE**

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. sections 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. section 157(b). Venue

is proper before this Court pursuant to 28 U.S.C. sections 1408 and 1409.

## II.  BACKGROUND

2. On June 6, 2010 (the "Petition Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their property as debtors in possession.

3. Concurrently herewith, the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

4. No creditors' committee has been appointed in this case by the United States Trustee.  Further, no trustee or examiner has been requested or appointed in this chapter 11 case.

**A.  Debtors' Business**

5. Majestic is a Texas corporation, incorporated in 1955, that operates Texas retail stores for the sale of liquor, beer, wine and bar supplies.  In May of 2004, John Bratton ("Bratton") and Kyle Fair ("Fair") acquired ownership of Majestic.  At the time of the acquisition, Majestic operated fourteen (14) retail stores and one (1) wholesale operation.  Through a series of acquisitions, Majestic grew to forty-five (45) retail locations and one (1) wholesale location.  As of September 30, 2009, the stores were located in the following areas:

| Area | No. of Stores |
|---|---|
| Dallas-Fort Worth | 16 |
| Hudson Oaks | 1 |
| Azle | 1 |
| Highland Village | 1 |
| East Texas | 9 |
| Austin | 1 |
| Roundrock | 1 |
| Lubbock | 10 |
| Granbury | 1 |
| Weatherford | 2 |
| Plainview | 2 |

6. Currently, Majestic operates forty-six (46) retail stores and three (3) wholesale locations and employs approximately 400 people, including 340 full-time employees and 60 part-time employees.

7. As of June 1, 2010, the Texas retails stores were located as follows: Dallas-Fort Worth stores (22); Lubbock County stores (9); Henderson County stores (3); Upshur County stores (2); Cherokee County stores (3); Austin stores (2); Kilgore stores (2); Plainview stores (2); and Granbury store (1).

8. For the year ended September 30, 2009, Majestic's audited financial statements reflected gross sales of $151,691,433. As of January 31, 2010, Majestic's unaudited financial statements reflected gross sales for the four months prior of $43,847,288.26.

9. Majestic Properties is a Texas limited partnership that owns real property leased to Majestic in Lubbock, Texas. Bratton and Fair are each limited partners of Majestic Properties. Majestic GP is the general partner in Majestic Properties.

10. Majestic Grapevine is a Texas limited partnership that owns real property leased to Majestic in Cuney, Texas. Bratton and Fair each are limited partners of Majestic Grapevine. Majestic GP II is the general partner in Majestic Grapevine.

**B. Events Leading to Bankruptcy**

11. In May of 2009, voters in Lubbock County approved two ballot propositions expanding packaged alcohol sales in the county. Prior to this local option election, alcohol sales were limited to a small section of the southeast part of Lubbock County on U.S. Highway 87 universally known as "The Strip." Majestic operated five (5) retail stores and a warehouse on The Strip.

12. Following the expansion of alcohol sales in Lubbock County, Majestic's sales dramatically decreased at its locations on The Strip. This decrease in overall sales in Lubbock County caused Majestic to close its retail operations on The Strip in the last year. Additionally, the downturn in the economy since 2008 coupled with the overall decline in consumer spending

has affected Majestic's sales and made certain other locations unprofitable.

**C.     Debtors' Secured Lender**

13.     As of the Petition Date, Majestic was a borrower under that certain Loan and Security Agreement dated April 27, 2009 (as amended and in effect and together with all related documents and agreements by and between Majestic as borrower and The F&M Bank & Trust Company ("F&M") as lender, the "Secured Loan Documents").  Fair and Bratton, in conjunction with the Secured Loan Documents, each entered into a Guaranty Agreement whereby each guaranteed up to $3 Million of the amount due under the Secured Loan Documents.  In conjunction with the Secured Loan Documents, Majestic, Majestic Properties and F&M entered into a subordination agreement whereby Majestic Properties agreed to the subordination of its debt and its liens to the debt and liens of F&M.

14.     On April 12, 2010, F&M entered into a temporary forbearance agreement with Majestic.  On or about April 21, 2010, F&M and Majestic entered into the First Amendment to the Secured Loan Documents (the "First Amendment") whereby F&M agreed to temporarily increase the revolving loan limit under the Secured Loan Documents and Majestic executed a Temporary Increase Note (the "Temporary Note") in the amount of $1,000,000 to be repaid on May 14, 2010.  In conjunction with the First Amendment and the Temporary Note, Fair and Bratton each provided a Guaranty guaranteeing the full amount of the Temporary Note.

15.     Pursuant to the Secured Loan Documents, F&M provided revolving credit and other financial accommodations to or for the benefit of Majestic, including, among other things, $16,000,000 in aggregate principal amount of revolving commitments, plus the additional $1,000,000 under the Temporary Note, including a letter of credit limit of $1,000,000.  As of the Petition Date, the outstanding principal amount owed under the Secured Loan Documents was at least $13.4M in revolving loans, advances and/or other financial accommodations or services.

16.     Under the Secured Loan Documents, Majestic granted to F&M security interests in and liens on, among other things:  (a) all accounts; (b) all general intangibles, including

Intellectual Property[1]; (c) all goods, including inventory and equipment; (d) all leasehold rights; (e) all money; (f) all fixtures; (g) all liquor permits and licenses of Majestic, to the extent permitted by applicable law; (h) all chattel paper, including all tangible and electronic chattel paper; (i) all instruments, including all promissory notes; (j) all documents; (k) all deposit accounts; (l) all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights; (m) all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of account debtors or other persons securing the obligations of account debtors; (n) all (i) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (ii) monies, credit balances, deposits and other property; (o) all commercial tort claims; (p) to the extent not otherwise described above, all Receivables; (q) all records; and (r) all products and proceeds of the foregoing, in any form, including insurance proceeds (collectively, the "F&M Collateral"). As of the Petition Date, F&M asserts that the F&M Collateral was perfected and senior in priority to all other liens or encumbrances of Majestic in the F&M Collateral.

17.     F&M asserts that all cash and cash equivalents, negotiable instruments, documents of title, securities, deposit accounts or any other cash equivalents in any form that

---

[1] As defined in the Secured Loan Documents.

are now or hereinafter in the Debtors' possession, custody or control including without limitation, the proceeds, products, offspring, rents or profits of the F&M Collateral constitute cash collateral of F&M within the meaning of 11 U.S.C. section 363 (hereinafter, the "F&M Cash Collateral").

### III.  REQUESTED RELIEF

18. By this Motion, the Debtors seek authority to use the F&M Cash Collateral and to grant adequate protection to F&M pursuant to sections 105, 361, 363, 506 and 552 of the Bankruptcy Code.  The Debtors propose to use F&M Cash Collateral for the expenditures outlined in the proposed budget for the use of cash for the Interim Period (the "Cash Budget") annexed hereto as **Exhibit "A"**.  The Debtors move the Court to authorize it to use F&M Cash Collateral both on an interim and final basis.  The Debtors request an emergency hearing for the approval of the use of such cash collateral on an interim basis pending a final hearing on this Motion pursuant to Bank. R.P. 4001(b).  The Debtors additionally request authority to grant adequate protection to F&M in the form of replacement liens and/or other adequate protection, to the extent deemed necessary for the use of the F&M Cash Collateral.

### IV.  ARGUMENT AND AUTHORITIES

19. It is essential to the continued operation of the Debtors' businesses that they obtain authority to use cash to fund payroll and other operating needs, including the costs of administration of these chapter 11 cases.  If the Debtors are permitted to use cash to fund ongoing business operations and administration of these chapter 11 cases, the Debtors currently project that ordinary and anticipated cash flows will be sufficient to cover expenses for the foreseeable immediate future.  Thus, the Debtors can continue to run their business successfully, but only if they are allowed to use their cash in the course of their day-to-day operations.  Without such use, the detrimental result to the Debtors' estates will be rapid and ultimately disastrous, given the nature of the Debtors' business.

20. Section 363(c)(2) of the Bankruptcy Code sets forth the requirements for a debtor's proposed use of cash collateral.  Specifically, section 363(c)(2) provides, in pertinent

part:

> The trustee [or debtor-in-possession] may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless – (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. section 363(c)(2).

21. Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title[.]

11 U.S.C. section 363(a).

22. Additionally, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or debtor-in-possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. section 363(e). Examples of adequate protection are provided in section 361 of the Bankruptcy Code and include, but are not limited to the following: (i) lump sum or periodic cash payments to the extent that such use will result in a decrease in value of such entity's interest in the property; (ii) provisions for an additional or replacement lien to the extent that the use of the property will cause a decrease in the value of such entity's interest in the property; and (iii) such other relief as will result in the realization by the entity of the indubitable equivalent of such entity's interest in the property. 11 U.S.C. section 361.

23. Moreover, the relief requested in the Motion is appropriate under section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

11 U.S.C. section 105(a).

24. Adequate protection under the Bankruptcy Code is designed to protect the secured lender from diminution in the value of its interest in the collateral as a result of the Debtor's proposed use or disposition of such collateral. The legislative history of section 361 of the Bankruptcy Code makes clear that bankruptcy courts are given broad flexibility in deciding what constitutes adequate protection on a case-by-case basis. Specifically, the legislative history provides:

> This section specifies the means by which adequate protection may be provided. It does not require the court to provide it. To do so would place the court in an administrative role. Instead, the trustee or debtor-in-possession will provide or propose a protection method. If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate. The purpose of this section is to illustrate means by which it may be provided and to define the contours of the concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977); see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987) (same); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985) (same); accord FDIC v. Mathis (In re Mathis), 64 B.R. 279, 284 (N.D.Tex. 1986) ("[T]he form of the adequate protection may vary on a case-by-case basis.").

25. As stated, the principal purpose of adequate protection is to safeguard the interest of the secured creditor in the particular collateral against diminution in the value of such interest during the period of use. See In re Gallegos Research Group, Corp., 193 B.R. 577, 584 (Bankr. D. Colo. 1995) (noting that all forms of adequate protection are designed to protect secured creditors from diminution in the value of their collateral); see also, In re Swedeland Dev. Group, Inc., 16 F.3d at 564 ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (quoting In re

O'Connor, 808 F.2d 1393 (10th Cir. 1987)); accord, In re DeSardi, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006) ("The purpose of adequate protection is to assure that the lender's economic position is not worsened because of the bankruptcy case."); In re Hollins, 185 B.R. 523, 524 (Bankr. N.D.Tex. 1995) ("Adequate protection seeks to protect a creditor from an [sic] decline in the value of its collateral . . . .").

26. Nevertheless, the "Court is not obligated to protect the creditor better than it did itself when making the loan and obtaining security." In re Heatron, Inc., 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). The interest to be protected by virtue of the adequate protection requirement is the lesser of the value of the debt or the value of assets securing the debt. See In re Triplett, 87 B.R. 25, 27 (Bankr. W.D.Tex. 1988) ("[U]nder the concept of adequate protection-only the preservation of the value of the lien is required.") (citing In re Alyucan Interstate Corp., 12 B.R. 803, 808 (Bankr. D. Utah 1981)); see also 11 U.S.C. section 506.

### a. The Secured Lender is Adequately Protected by the Debtors' Continued Operation of Their Businesses

27. Courts have held that adequate protection may be demonstrated by a showing that the going concern value of the debtors is preserved by the debtor's continuing operations and use of cash collateral. See, e.g., Bray v. Shenandoah Fed. Loan Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1087-89 (4th Cir. 1986) (finding that ski resort would lose 50% to 90% of its fair market value if it ceased operations); In re Wrecclesham Grange, Inc., 221 B.R. 978, 980-81 (Bankr. M.D. Fla. 1997) (stating that one fact that the debtor can show to establish adequate protection is that a good prospect for a reorganization exists); In re Constable Plaza Assocs., L.P., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor entitled to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); accord Mendoz v. Temple-inland Mortgage Corp. (In re Mendoza), 111 F.3d 1264, 1272 n. 3 (5th Cir. 1997) ("While the amount of equity in the property is the primary factor that courts look to in an adequate protection analysis, other factors include

the following: the value of the collateral . . . and the prospects for successful reorganization of the debtor's affairs.").

28. In the instant case, F&M is adequately protected by virtue of the Debtors' continued operation of their businesses and expenditure of cash on maintaining the business. In stark contrast to a going concern, in a liquidation scenario, the value of the F&M's Collateral will be severely impacted. Even under the most conservative multiples for going concern value, going concern value far exceeds liquidation value. Accordingly, expenditures of cash collateral to preserve and maintain the underlying property provide additional adequate protection to a secured creditor. See, e.g., In re 499 W. Warren St. Assocs., Ltd. P'ship, 142 B.R. 53, 56-57 (Bankr. N.D.N.Y. 1992) (finding secured creditor's interest in collateral adequately protected when cash collateral applied to normal operating and maintenance expenditures on collateral property); In re Willowood East Apartments of Indianapolis II, Ltd., 114 B.R. 138, 143 (Bankr. S.D. Ohio 1990) (finding secured creditor's interest in assigned rents extended only to net rents after payment of ordinary, necessary expenses required to maintain and operated the property to preserve its value.). Thus, it is essential to the maintenance of the F&M Collateral that the Debtors' operations are maintained as a going concern.

29. Without the ability to use cash, the Debtors will be forced to liquidate their assets and lose the real opportunity to preserve value not only for F&M, but for the Debtors' other stakeholders as well. If the Debtors are precluded from maintaining their assets, or if the Debtors are forced to effect a fire-sale liquidation of their facilities, no creditor — secured or unsecured — will benefit. See, e.g., In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citations omitted); accord In re Triplett, 87 B.R. at 27 ("[R]estriction of the use of

cash collateral should only occur where the facts show that failure to restrict use may 'impair' the creditor and deny the creditor adequate protection.").[2]

30. Accordingly, the interests of F&M (as well as those of the Debtors' other creditors and parties in interest) will be best served by permitting the Debtors' continued use of cash, including the F&M Cash Collateral.

    **b. The Secured Lender Is Adequately Protected by the Grant of Replacement Liens**

31. The Debtors anticipate generating positive cash flow from operations. Thus, new cash and cash-generating assets, including accounts receivable, will become available for replacement liens at a greater rate than cash, including the F&M Cash Collateral, is spent. See, e.g., In re Cafeteria Operators, L.P., 299 B.R. 400, 410 (Bankr. N.D. Tex. 2003) (authorizing the use of bank's cash collateral but granting bank "a replacement lien on the inventory purchased post-petition" but if "inventory levels decrease" such that bank's collateral is actually being utilized then bank would be "granted a replacement lien in any other assets of Debtor, at the highest available priority" as needed to restore and maintain the bank's secured position in inventory as of the Petition Date); MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1398 (10th Cir. 1987) (affirming bankruptcy court's determination that there was adequate protection where creditors were offered replacement liens on well proceeds and on other unencumbered regular monthly income); In re Wrecclesham Grange, Inc., 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997) (noting that a replacement lien of equal value on postpetition rents is adequate protection); In re Stein, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982) (continued lien on debtors' crops, livestock and equipment resulted in an increase rather than a decrease in collateral, and debtors were granted authority to use cash collateral to meet operating expenses

---

[2] Moreover, even to the extent some diminution in value did occur, section 507(b) of the Bankruptcy Code provides prepetition secured creditors which suffer a diminution in the value of their prepetition collateral as a result of their property being sold or used by the Debtors pursuant to section 363 of the Bankruptcy Code with a superpriority claim in an amount equal to such diminution.

during chapter 11 proceedings). Therefore, adequate protection to F&M can be provided and maintained through a grant of post-petition replacement liens and security interests to the extent of any diminution in value of the F&M Collateral.

## V. THE NEED FOR IMMEDIATE RELIEF PENDING A FINAL HEARING

32. Pursuant to Bankruptcy Rule 4001(b), a final hearing on a motion to use cash collateral may not be commenced earlier than 15 days after service of such motion. The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such 15-day period and to authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

33. Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court (i) schedule an interim hearing and final hearing (the "Final Hearing") to consider approval of the Debtors' use of cash, including F&M Cash Collateral and (ii) authorize the Debtors' use of cash, including F&M Cash Collateral to pay for and fund all costs and expenses incurred in the ordinary course of their businesses and in connection with or related to the administration of their chapter 11 cases in accordance with the Cash Budget, pending the Final Hearing and the determination of this Motion. If the Debtors are unable to obtain the immediate use of cash, they will be required to curtail their operations substantially with a concomitant immediate and irreparable harm to the value of their businesses and estates.

## VI. LIMITED NOTICE

34. Notice of this Motion has been provided to (i) the office of the United States Trustee for the Northern District of Texas; (ii) Majestic's prepetition secured lender; (iii) the holders of the twenty (20) largest unsecured claims against Majestic; and (iv) certain other counsel and/or parties-in-interest; as all set forth in more detail in a separate Certificate of Service to be filed in conjunction with this Motion. The Debtors submit that no other further notice need be provided.

## PRAYER

WHEREFORE, the Debtors respectfully request the Court grant the above Motion and grant all such other and further relief as is just and proper.

Dated: June 6, 2010                  Respectfully submitted,

/s/ Jeff P. Prostok
J. Robert Forshey
State Bar No. 07264200
Jeff P. Prostok
State Bar No. 16352500
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
bforshey@forsheyprostok.com
jprostok@forsheyprostok.com

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

## CERTIFICATE OF CONFERENCE

On June 5, 2010, I spoke with Trey Monsour, counsel for the Lender, and certify that the relief requested in the Motion is unopposed.

/s/ Jeff P. Prostok

L:\BFORSHEY\Majestic Liquor #5363\Pleadings\Motion to Use Cash Collateral 6.610.doc

# EXHIBIT "A"

**Majestic Liquor Stores, Inc.**
Cash Collateral Budget
For the Period 6/6- 8/12010

## Cash Collateral Budget

| Week # | Note | 0 Actual 6/6/10 | 1 Forecast 6/13/10 | 2 Forecast 6/20/10 | 3 Forecast 6/27/10 | 4 Forecast 7/4/10 | 5 Forecast 7/11/10 | 6 Forecast 7/18/10 | 7 Forecast 7/25/10 | 8 Forecast 8/1/10 | 13 Week Post-Petition Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Collections** | 1,2 | | | | | | | | | | |
| Store Sales | | | 2,415,922 | 2,415,922 | 2,415,922 | 2,474,543 | 2,474,543 | 2,474,543 | 2,474,543 | 2,474,543 | 19,620,482 |
| Sales Taxes In Trust | | | 176,362 | 176,362 | 176,362 | 180,642 | 180,642 | 180,642 | 180,642 | 180,642 | 1,432,295 |
| Misc. Income, Lottery, Service Fees | | | 2,137 | 2,137 | 1,930 | 2,970 | 2,970 | 2,970 | 2,765 | 2,778 | 20,657 |
| Returned Checks & Cash Over (Short) | | | (2,094) | (2,094) | (2,094) | (1,607) | (1,607) | (1,607) | (1,607) | (1,607) | (14,319) |
| **Total Collections** | | | 2,592,327 | 2,592,327 | 2,592,120 | 2,656,548 | 2,656,548 | 2,656,548 | 2,656,343 | 2,656,356 | 21,059,115 |
| **Operating Disbursements** | | | | | | | | | | | |
| Purchases - Wine & Spirits ex Beer | 3 | | 160,000 | 1,800,000 | 160,000 | 2,000,000 | 160,000 | 2,000,000 | 160,000 | 2,000,000 | 8,440,000 |
| Beer Drafts Daily | 4 | | 500,000 | 500,000 | 700,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 4,200,000 |
| Non Alcoholic Purchases | | | 225,000 | 100,000 | 100,000 | 100,000 | 100,000 | 225,000 | 100,000 | 100,000 | 1,050,000 |
| Gasoline | | | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 160,000 |
| Payroll | 5 | | | 325,000 | | 310,000 | | 310,000 | | 310,000 | 1,275,000 |
| Payroll Taxes | 6 | | 100,000 | | 100,000 | | 95,000 | | 95,000 | 95,000 | 485,000 |
| Benefits | | | 20,000 | 20,000 | 20,000 | 57,000 | 23,000 | 20,000 | 20,000 | 20,000 | 200,000 |
| Rent Expense | | | 6,500 | | | 525,000 | | | | | 531,500 |
| Utilities | 10 | | 39,000 | 39,000 | 44,000 | 39,000 | 39,000 | 39,000 | 39,000 | 39,000 | 317,000 |
| Insurance - P&C | 7 | | | 38,000 | | 30,000 | | 38,000 | | | 106,000 |
| Sales Taxes | 8 | | | 760,000 | | | | 760,000 | | | 1,520,000 |
| Property Taxes | 15 | | | | 245,000 | | | | | | 245,000 |
| Licenses & Permits | | | 1,500 | 1,500 | 1,500 | 10000 | 1,500 | 1,500 | 1,500 | 1,500 | 20,500 |
| Credit Card Fees, Sales Expense | 9 | | 25,035 | 25,035 | 24,813 | 25,568 | 25,568 | 25,568 | 25,487 | 25,487 | 202,560 |
| Supplies | 11 | | 9,598 | 9,598 | 9,598 | 8,880 | 8,880 | 8,880 | 8,880 | 8,880 | 73,197 |
| Legal & Professional - non Ch 11 | | | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 | 48,000 |
| Maintenance, Repair, Office & Misc. | 11 | | 31,142 | 31,142 | 31,142 | 23,764 | 23,764 | 23,764 | 23,764 | 23,764 | 212,246 |
| Inventory Service | | | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 26,400 |
| Bank Fees | | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 8,000 |
| Equipment Rental | 11 | | | | 1,500 | | | | 1,500 | | 3,000 |
| Supplies | 11 | | 9,598 | 9,598 | 9,598 | 8,880 | 8,880 | 8,880 | 8,880 | 8,880 | 73,197 |
| Advertising, Contributions, Dues | 11 | | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 60,400 |
| Auto, Travel, Promotion, Meals, Ent. | 11 | | 10,401 | 7,443 | 7,443 | 7,443 | 7,443 | 7,443 | 7,443 | 7,443 | 62,502 |
| Contingency | | | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 56,000 |
| **Total Expenses** | | | 1,182,626 | 3,711,167 | 1,499,445 | 3,690,385 | 1,037,885 | 4,012,885 | 1,056,304 | 3,184,804 | 19,375,502 |
| Operating Cash Flow | | | 1,409,701 | (1,118,841) | 1,092,675 | (1,033,838) | 1,618,662 | (1,356,338) | 1,600,039 | (528,449) | 1,683,613 |
| Cumulative Operating Cash Flow | | | 1,409,701 | 290,861 | 1,383,535 | 349,698 | 1,968,360 | 612,022 | 2,212,061 | 1,683,613 | |
| **Non-Operating Disbursements** | | | | | | | | | | | |
| Adequate Protection - F&M Bank | 14 | | | | 68,000 | | | | 68,000 | | 136,000 |
| Professional Fees | 12 | | | | | 150,000 | | | 80,000 | | 230,000 |
| US Trustee Fees | | | 1,500 | | | | | | 13,000 | | 14,500 |
| Bank Fees | 13 | | | | | | | | | | |
| Total Non-Operating Disb. | | | 1,500 | | 68,000 | 150,000 | | | 161,000 | | 380,500 |
| TOTAL DRAWS / DISBURSEMENTS | | | 1,184,126 | 3,711,167 | 1,567,445 | 3,840,385 | 1,037,885 | 4,012,885 | 1,217,304 | 3,184,804 | 19,756,002 |
| NET CASH FLOW | | | 1,408,201 | (1,118,841) | 1,024,675 | (1,183,838) | 1,618,662 | (1,356,338) | 1,439,039 | (528,449) | 1,303,113 |
| Cumulative | | | 1,408,201 | 289,361 | 1,314,035 | 130,198 | 1,748,860 | 392,522 | 1,831,561 | 1,303,113 | |
| BEGINNING CASH ON HAND | | | 856,000 | 2,264,201 | 1,145,361 | 2,170,035 | 986,198 | 2,604,860 | 1,248,522 | 2,687,561 | 2,159,113 |
| ENDING CASH ON HAND | | 856,000 | 2,264,201 | 1,145,361 | 2,170,035 | 986,198 | 2,604,860 | 1,248,522 | 2,687,561 | 2,159,113 | |
| | | | | | | | | | | | |
| BEGINNING LOAN BALANCE | | $ - | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | |
| ENDING LOAN BALANCE | | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | $ 13,410,148 | |
| ENDING INVENTORY | | $ 18,224,450 | $ 17,547,138 | $ 17,028,402 | $ 16,878,402 | $ 16,703,402 | $ 16,603,402 | $ 16,453,402 | $ 16,353,402 | $ 16,353,402 | |
| ENDING INVENTORY PLUS CASH ON HAND | | $ 19,080,450 | $ 19,811,339 | $ 18,173,763 | $ 19,048,437 | $ 17,689,600 | $ 19,208,262 | $ 17,701,924 | $ 19,040,963 | $ 18,512,515 | |
| BANK EQUITY CUSHION | 16 | 42% | 48% | 36% | 42% | 32% | 43% | 32% | 42% | 38% | |
| ENDING AVAILABILITY EXCL. CASH ON HAND | | $ (71,325) | $ (579,309) | $ (968,361) | $ (1,080,861) | $ (1,212,111) | $ (1,287,111) | $ (1,399,611) | $ (1,474,611) | $ (1,474,611) | |
| ENDING AVAILABILITY INCL CASH ON HAND | | $ 784,676 | $ 1,684,893 | $ 177,000 | $ 1,089,175 | $ (225,913) | $ 1,317,750 | $ (151,088) | $ 1,212,951 | $ 684,502 | |

**Majestic Liquor Stores, Inc.**
Cash Collateral Budget
For the Period 6/6 - 8/1/2010

CONFIDENTIAL
DRAFT SUBJECT TO REVISION
June 5, 2010

## Assumptions

| # | Item | Assumption |
|---|------|------------|
| 1 | Sales | Store Sales are based upon management's monthly base case estimate. Weekly sales are derived by dividing the number of days of store operations in each month and a six day store operations week. |
| 2 | Collections | No lag is assumed between sales and collections. |
| 3 | Wine & Spirits | Wine and sprit obligations pre-petition are assumed to be critical vendors based upon TABC regulations requiring payment twice a month. |
| 4 | Beer | Beer is paid for by daily by ACH to processor agent on behalf of beer vendors. Beer is paid for by daily by ACH to processor agent on behalf of beer vendors. |
| 5 | Payroll & Payroll Taxes | Paid bi-weekly |
| 6 | Quarterly FUTA SUTA | Quarterly FUTA & SUTA not due till mid July. |
| 7 | Insurance | Property & casualty payments reflect premium financing agreement. |
| 8 | Sales & Excise Taxes | State sales taxes are paid on the 20th of each month. Pre-petition amounts owing are assumed paid post-petition with Court approved from a first day motion. |
| 9 | Credit Card Fees | Credit card fees are assumed to be paid daily as a contra by the processor against credit card receipts. It is further assumed that pre-petition fees are subject to a first day order allowing payment. |
| 10 | Utilities | Utility Expenses are shown as paid mid month following accrual and billing. May pre-petition utilities are assumed paid post-petition subject to Court approval through a first day motion. |
| 11 | General expenses | Assumed to be paid weekly predominantly on COD or limited terms. |
| 12 | Professional Fees | Post-petition professional fees are assumed to be covered by a standing interim fee application process. Payment of June fees would presumably not occur until late July. |
| 13 | Bank Fees | No allowance has been made for bank fees or bank counsel fees |
| 14 | Interest or Adequate Protection | |
| 15 | Property Taxes | Represents Tarrant County property taxes payable June 30, 2010. |
| 16 | Bank equity cushion | No value shown for cash in transit, credit card receipts in transit, or enterprise value of stores. |