J. Robert Forshey
State Bar No. 07264200
Jeff P. Prostok
State Bar No. 16352500
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
bforshey@forsheyprostok.com
jprostok@forsheyprostok.com

ATTORNEYS FOR MAJESTIC
LIQUOR STORES, INC., MAJESTIC TEXAS-
GRAPEVINE, L.P. AND MAJESTIC GP II, LLC

Joseph F. Postnikoff
State Bar No. 16168320
GOODRICH POSTNIKOFF & ALBERTSON, LLP
777 Main St., Suite 1360
Fort Worth, TX 76102
Telephone: (817) 335-9400
Facsimile: (817) 335-9411
jpostnikoff@gpalaw.com

ATTORNEYS FOR MAJESTIC TEXAS
PROPERTIES, L.P. AND MAJESTIC GP, LLC

John Y. Bonds, III
State Bar No. 02589100
SHANNON, GRACEY, RATLIFF & MILLER, LLP
777 Main St., Suite 3800
Fort Worth, TX 76102
Telephone: (817) 336-9333
Facsimile: (817) 336-3735
jbonds@shannongracey.com

ATTORNEYS FOR JOHN MELVIN
BRATTON, KYLE TATE FAIR AND SUZANNE
PATRICIA FAIR

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| MAJESTIC LIQUOR STORES, INC., *et al.*, | ) | Case No. 10-43849-rfn11 |
| | ) | |
| Debtors. | ) | **Jointly Administered** |

## SECOND AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE WITH RESPECT TO THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR MAJESTIC LIQUOR STORES, INC., AND ITS AFFILIATED DEBTORS

Dated:    November 30, 2010.

Majestic Liquor Stores, Inc. and its affiliated debtors in the above-captioned jointly administered chapter 11 cases hereby submit this Second Amended Disclosure Statement Pursuant to Section 1125 of the United States Bankruptcy Code with Respect to the Second Amended Joint Chapter 11 Plan of Reorganization for Majestic Liquor Stores, Inc., and its Affiliated Debtors (the "Disclosure Statement"). This Disclosure Statement is to be used in connection with the solicitation of votes on the Second Amended Joint Chapter 11 Plan of Reorganization for Majestic Liquor Stores, Inc., and its Affiliated Debtors dated November 30, 2010 (the "Plan"). A copy of the Plan is attached hereto as **Exhibit "A"**. Unless otherwise defined herein, terms used herein have the meanings ascribed thereto in the Plan (see Article I of the Plan).

For a general summary of the proposed treatment of Claims or Interests under the Plan, please see the chart below.

## I. NOTICE TO HOLDERS OF CLAIMS

**A.    Generally**

The purpose of this Disclosure Statement is to enable Creditors whose Claims are impaired to make an informed decision in exercising their right to vote to accept or reject the Plan.

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

On ▨▨▨▨▨▨▨, 2010, the Bankruptcy Court entered an order pursuant to section 1125 of the Bankruptcy Code (the "Disclosure Statement Order") approving this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the solicited holders of Claims against and Interests in the Debtors, to make an informed judgment with respect to the acceptance or rejection of the Plan. A copy of the Disclosure Statement Order is included in the materials accompanying this Disclosure Statement. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR MERITS OF THE PLAN.

The statements contained in the Disclosure Statement are made as of the date hereof unless another time is specified, and neither delivery of the Disclosure Statement nor any exchange of rights made in connection with the Plan shall, under any circumstances, create an implication that there has not been any change in the information set forth herein since the date the Disclosure Statement and the materials relied on in preparation of the Disclosure Statement were compiled.

Accounting information set forth in the Disclosure Statement and attached projections is, unless otherwise noted, based upon the accrual method of accounting.

For the convenience of Creditors and parties in interest, this Disclosure Statement summarizes the terms of the Plan, but the Plan itself qualifies all summaries. This Disclosure Statement is qualified in its entirety by the terms of the Plan. If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling.

Each Claimant should consult the Claimant's individual attorney, accountant and/or financial advisor as to the effect of the Plan on such Claimant.

Each holder of a Claim or Interest entitled to vote to accept or reject the Plan should read

this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors and their professionals, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan, other than the information contained herein, in connection with the solicitation of votes to accept or reject the Plan. No holder of a Claim entitled to vote on the Plan should rely upon any information relating to the Debtors, their businesses, or the Plan other than that contained in this Disclosure Statement and the exhibits hereto. Unless otherwise indicated, the source of all information set forth herein is the Debtors.

The Disclosure Statement may not be relied on for any purpose other than to determine whether to vote in favor of or against the Plan and related options and elections, and nothing contained herein shall constitute an offer to sell or purchase a security as defined by state or Federal securities law or an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtors or any other party, or be deemed conclusive evidence of the tax or other legal effects of the reorganization of the Debtors on holders of Claims or Interests. Certain of the information contained in the Disclosure Statement, by its nature, is forward looking, contains estimates and assumptions which may prove to be wrong, and contains forecasts which may prove to be wrong or which may be materially different from actual results.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and returning the same to the address set forth on the ballot, in the enclosed return envelope so that it will be received by no later than 5:00 P.M., CENTRAL TIME, ON ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, 2010.

If you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim or Interest, you may be bound by the Plan if it is accepted by the requisite holders of Claims or Interests. See "Confirmation of the Plan – Solicitation of Votes; Vote Required for Class Acceptance" beginning on page 51 and "Cramdown" beginning on page 55 of this Disclosure Statement.

TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 5:00 P.M., CENTRAL TIME, ON ▓▓▓▓▓▓▓▓▓▓▓▓▓▓, 2010. For detailed voting instructions and the name, address, and phone number of the person you may contact if you have questions regarding the voting procedures, see "Confirmation of the Plan – Solicitation of Votes; Voting Procedures – Parties In Interest Entitled to Vote" beginning on page 50 of this Disclosure Statement.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), on December 21, 2010 at 9:30 a.m., Central Time, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before 4:30 p.m., Central Time, ▓▓▓▓▓▓▓▓▓▓▓▓, 2010 , in the manner described under the caption, "Confirmation of the Plan – Confirmation Hearing" beginning on page 51 of this Disclosure Statement.

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS TO VOTE TO ACCEPT THE PLAN.

## B. Summary of Treatment Under The Plan

The following is an estimate of the numbers and amounts of classified Claims and Interests to receive treatment under the Plan, and a summary of the proposed treatment of such Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of Claims and Interests.

The bar date, unless extended by order of the Bankruptcy Court, for filing proofs of claim was October 14, 2010. The table below is drawn from the Debtors' Schedules and/or filed Proofs of Claim. The final universe of Claims, as actually Allowed, may differ from this table.

| Class | Treatment |
|---|---|
| **Class 1 – Convenience Claims Against Majestic**<br><br>**Estimated Amount: $327,000**<br><br>**Estimated Number of Holders: 195** | **Impaired.**<br><br>Each holder of an Allowed Convenience Claim shall receive, within six (6) months of the Effective Date, a single cash payment in an amount equal to one hundred percent (100%) of such holder's Allowed Convenience Claim. All payments on account of Allowed Class 1 Claims shall be made by Reorganized Majestic.<br><br>**Estimated Recovery: 100%** |
| **Class 2 – Unsecured (General) Claims Against Majestic**<br><br>**Estimated Amount: $10,692,000**<br><br>**Estimated Number of Holders: 12[1]** | **Impaired.**<br><br>Holders of Allowed Unsecured (General) Claims against Majestic shall be paid and treated as follows:<br><br>The unpaid balance of all Allowed Class 2 Claims shall bear interest from and after the Effective Date until paid at the Plan Rate.<br><br>Each holder of an Allowed Class 2 Claim shall receive distributions equal to 100% of such Allowed Claim, plus interest thereon calculated as |

---

[1] Two of the Claims included in Class 2 are held by insiders of Majestic. The first such insider Claim is a Rejection Claim held by Majestic Properties against Majestic and filed in the amount of $2,780,881. Such Rejection Claim is on account of Majestic's rejection of its lease of the Majestic Properties Lubbock Property. NNN holds a security interest in and lien on such Rejection Claim and, pursuant to Article 4.6 of the Plan and Exhibit "B" to the Plan, all amounts to be paid by Reorganized Majestic under Article 4.2 of the Plan on account of such Rejection Claim shall be paid directly to NNN. Accordingly, Majestic Properties shall receive no distributions under Article 4.2 of the Plan on account of its Rejection Claim against Majestic. The other Class 2 Claim held by an insider is a Rejection Claim held by Majestic Grapevine against Majestic and filed in the amount of $472,819.25. Such Rejection Claim in on account of Majestic's rejection of its lease of the Cuney Property. Pursuant to Article 4.5 of the Plan, until the Wells Fargo Claim has been paid in full, all amounts distributed by Majestic to Majestic Grapevine under Article 4.2 of the Plan on account of such Rejection Claim shall be paid over by Majestic Grapevine to Wells Fargo within seven (7) business days of Majestic Grapevine's receipt of such distributions. Accordingly, until the Wells Fargo Claim has been paid in full, Majestic Grapevine will receive, but will not retain, distributions from Majestic on account of Majestic Grapevine's Rejection Claim against Majestic.

| Class | Treatment |
|---|---|
| | set forth in Article 4.2(a) of the Plan, payable as set forth in Articles 4.2(c), (d) and (e) of the Plan.<br><br>No later than the tenth (10th) day of the eighth (8th) calendar month beginning after the Effective Date, and continuing thereafter until all Allowed Class 2 Claims are paid in full, Reorganized Majestic shall distribute each month the sum of $125,000. Each such $125,000 distribution shall be paid *pro rata* to (i) the holders of Allowed Class 2 Claims and (ii) NNN on account of the NRP Deficiency as required under Article 4.6 of the Plan. With respect to the portion of each such $125,000 distribution paid to holders of Allowed Class 2 Claims, each such payment shall be applied first to accrued interest on such Class 2 Claims through the last day of the calendar month immediately preceding the calendar month in which payment is due, and then to the payment of the principal amount of each such Claim.<br><br>Until all Allowed Class 2 Claims are paid in full, no later than the March 31 immediately following the end of each Distribution Year, Reorganized Majestic shall deposit funds (the "Additional Distribution Funds") into a separate escrow account to be held for the benefit of holders of Allowed Class 2 Claims. The amount of the Additional Distribution Funds shall be based on a formula to be negotiated between Majestic and the Committee considering Reorganized Majestic's need for working capital, the amount of the available cash and/or availability on its line of credit, the covenants on Reorganized Majestic's line of credit and the use of capital to open additional locations. No distribution of any Additional Distribution Funds shall be made to holders of Allowed Class 2 Claims until the New F&M Bank Note has been paid in full. If on the date the New F&M Bank Note is paid in full the amount of Additional Distribution Funds exceeds the remaining unpaid balance owed on all Allowed Class 2 Claims, Reorganized Majestic shall, within ten (10) days of the date on which the New F&M Bank Note is paid in full, distribute to the holders of Allowed Class 2 Claims that amount of Additional Distribution Funds necessary to fully pay the remaining unpaid balance of all Allowed Class 2 Claims. If on the date the New F&M Bank Note is paid in full the amount of Additional Distribution |

| Class | Treatment |
|---|---|
| | Funds is less than the remaining unpaid balance owed on all Allowed Class 2 Claims, Reorganized Majestic shall (i) distribute the Additional Distribution Funds to holders of Allowed Class 2 Claims on a *pro rata* basis within ten (10) days of the date on which the New F&M Bank Note is paid in full (the "Initial Additional Distribution"), and (ii) make a distribution of Additional Distribution Funds to holders of Allowed Class 2 Claims by no later than each March 31 subsequent to the date on which the Initial Additional Distribution is made; *provided, however,* that the entire balance of the Allowed Class 2 Claims shall be due and payable on the fifth (5th) anniversary of the first monthly distribution of $125,000 made pursuant to Article 4.2(c) of the Plan.<br><br>If any Class 2 Claim is or becomes a Disputed Claim, Reorganized Majestic shall make distributions on account of such Claim, without waiver or compromise of any objection thereto, based upon either (i) the proof of claim filed by any such Class 2 Claimant, or (ii) an order of the Bankruptcy Court estimating the amount of any such Class 2 Claim for purposes of distributions until it becomes an Allowed Claim. If any Disputed Claim is ultimately Allowed in an amount less than the amount used to calculate distributions while a Disputed Claim, then the amount of any overpayment to such Claimant shall be subtracted from future distributions on account of such Allowed Class 2 Claim until the amount of the overpayment has been recouped, after which distributions will be made based on the Allowed amount of such Class 2 Claim. If such Class 2 Claim is ultimately Allowed in an amount greater than the amount used to calculate distributions while a Disputed Claim, the first dollars of any subsequent distribution to Class 2 Creditors will be distributed to any such underpaid Class 2 Claimant until each has been paid the appropriate *pro rata* amount on account of such Allowed Claim based on the distributions to date.<br><br>All such payments on account of Allowed Class 2 Claims shall be made by Reorganized Majestic.<br><br>The NRP Rejection Claim is classified and treated as a Class 2 Claim and the NRP Rejection Claim shall be deemed Allowed in the amount of |

| Class | Treatment |
|---|---|
| | $3,500,000 on the Effective Date. Within three (3) Business Days of a Change of Control of Reorganized Majestic, the NRP Rejection Claim shall be paid in full. NRP shall have the exclusive right to waive the requirement that the NRP Rejection Claim be paid in full within three (3) Business Days of a Change of Control of Reorganized Majestic.<br><br>**Estimated Recovery: 100%**[2] |
| **Class 3** – **F&M Bank Claim**<br><br>**Estimated Amount: $12,400,000**<br><br>**Total Holders: 1** | **Impaired.**<br><br>In full satisfaction of the F&M Bank Claim, Reorganized Majestic shall execute and deliver to F&M Bank the New F&M Bank Note dated as of the Effective Date of the Plan, payment of which will be secured by the liens granted to F&M Bank pursuant to the F&M Bank Exit Facility Documents. The liens granted to F&M Bank pursuant to the F&M Bank Exit Facility Documents shall be retained by F&M Bank until the New F&M Bank Note has been paid in full. The principal terms of the F&M Bank Exit Facility and the New F&M Bank Note are set forth in **Exhibit "A"** to the Plan.<br><br>**Estimated Recovery: 100%** |
| **Class 4** – **Ad Valorem Tax Claims Against the Majestic Debtors**<br><br>**Estimated Amount: $721,000**<br><br>**Estimated Number of Holders: 25** | **Impaired**<br><br>Except to the extent that any holder of an Ad Valorem Tax Claim and the Majestic Debtors agree otherwise, Allowed Ad Valorem Tax Claims against the Majestic Debtors shall be paid and treated as follows:<br><br>All Allowed Ad Valorem Tax Claims against the Majestic Debtors shall bear interest at the applicable statutory rate of interest determined |

---

2 Payment in full of all Allowed Class 2 Claims is contingent on, *inter alia*, the following: (i) Reorganized Majestic's financial performance being strong enough to fund all distributions required to be made to holders of Allowed Class 2 Claims over the period of five (5) years during which such distributions must be made pursuant to Article 4.2 of the Plan; (ii) Majestic's ability to fully pay the New F&M Bank Note (which shall mature three (3) years after the Effective Date of the Plan) on or prior to the maturity date of the same; (iii) Majestic's ability to obtain replacement financing for the F&M Bank Exit Facility on or prior to the maturity date of the New F&M Bank Note; and (iv) Majestic's ability to make the final distribution on account of all Allowed Class 2 Claims (which final distribution shall be in the approximate amount of $3 million) when due in August, 2016.

| Class | Treatment |
|---|---|
| | under applicable nonbankruptcy law during the month in which the Plan is confirmed. Each holder of an Allowed Ad Valorem Tax Claim shall receive distributions equal to one hundred percent (100%) of such Allowed Claim, payable in sixteen (16) substantially equal quarterly installment payments, each including both principal and interest, without penalties. The first such installment shall be due and payable on the applicable Initial Distribution Date, with a like installment being due and payable quarterly thereafter until such Allowed Ad Valorem Tax Claim is paid in full. For example, if the applicable Initial Distribution Date is February 1, future quarterly installments will be due and payable on May 1, August 1 and November 1.<br><br>The holders of Allowed Ad Valorem Tax Claims against the Majestic Debtors shall retain their Liens on the applicable portion of the Majestic Debtors' Assets until such Allowed Claims are paid in full.<br><br>The Reorganized Majestic Debtors may, in the exercise of their sole discretion, accelerate the payment schedule as to any Allowed Ad Valorem Tax Claim. The Reorganized Majestic Debtors shall never have any obligation to accelerate the payment schedule as to any such Class 4 Creditor, but may do so on a case-by-case basis, on such terms and in such manner as the Reorganized Majestic Debtors, in the exercise of their sole discretion, may deem appropriate.<br><br>All payments on account of Allowed Class 4 Claims shall be made by the Reorganized Majestic Debtor responsible for such Allowed Ad Valorem Tax Claim.<br><br>**Estimated Recovery: 100%** |
| <u>**Class 5**</u> **– Wells Fargo Claim**<br><br>**Estimated Amount: $1,033,000**<br><br>**Total Holders: 1** | **Impaired.**<br><br>Except to the extent that Wells Fargo and Majestic Grapevine agree otherwise in writing, the Wells Fargo Claim shall be paid and treated as follows:<br><br>If it has not already done so, Wells Fargo shall proceed to foreclose its Lien against the Cuney Property in accordance with the applicable provisions of the Texas Property Code. |

| Class | Treatment |
|---|---|
| | If the price paid at the foreclosure sale of the Cuney Property is insufficient to fully satisfy the Wells Fargo Claim, the amount of the Wells Fargo Deficiency shall be determined by the Bankruptcy Court in accordance with the applicable provisions of Chapter 51 of the Texas Property Code.<br><br>On account of the Wells Fargo Deficiency, if any, Wells Fargo shall receive:<br><br>    (i)    On the first day of the second calendar month following the calendar month in which the amount of the Wells Fargo Deficiency is determined, a cash payment equal to the lesser of (A) the amount of the Wells Fargo Deficiency, or (B) $60,000; and<br><br>    (ii)    In the event that the cash payment required under Article 4.5(c)(i) of the Plan is insufficient to fully satisfy the Wells Fargo Deficiency, one or more cash payments equal to the lesser of (A) the remaining unpaid balance of the Wells Fargo Deficiency, or (B) the amount paid to Majestic Grapevine by Majestic pursuant to the Plan on account of Majestic Grapevine's Rejection Claim against Majestic arising as a result of Majestic's rejection of the lease between Majestic and Majestic Grapevine with respect to the Cuney Property.[3] Any such cash payment(s) required under Article 4.5(c)(ii) of the Plan shall be made by Majestic Grapevine to Wells Fargo within seven (7) Business Days of the date(s) on which Majestic Grapevine receives payment(s) from Majestic pursuant to the Plan on account of Majestic Grapevine's Rejection Claim.<br><br>All payments on account of Wells Fargo Claim shall be made by Reorganized Majestic Grapevine.<br><br>**Estimated Recovery: 100%** |
| **Class 6 – NRP Claim**<br><br>**Estimated Amount: $7,623,031.78** | **Impaired**<br><br>NNN shall receive the following treatment and consideration in full, final and complete |

---

[3] The Amount of the Rejection Claim held by Majestic Grapevine against Majestic is $472,819.25.

| Class | Treatment |
|---|---|
| **Total Holders: 1** | satisfaction of: (a) the NRP Claim; (b) proofs of claim nos. 65 and 69 filed by NNN in Case No. 10-43849-rfn11; (c) proof of claim no. 5 filed by NNN in Case No. 10-43883-rfn11; (d) proof of claim no. 10 filed by NNN in Case No. 10-43885-rfn11; and (e) proof of claim no. 9 filed by NNN in Case No. 10-43850-rfn11:[4]<br><br>On the Effective Date, the NRP Deficiency shall be deemed an Allowed Claim in the amount of $7,623,031.78.<br><br>In full satisfaction of the NRP Deficiency, on the Effective Date, the Reorganized Debtors shall issue a promissory note in the principal amount of $7,623,031.78 (the "NRP Deficiency Note").<br><br>The NRP Deficiency Note shall: (a) bear interest from and after the Effective Date until paid at five and one-half percent (5.5%) per annum; (b) be fully recourse to both the Reorganized Majestic Debtors and the Reorganized Individual Debtors; (c) be secured by a valid, perfected and enforceable security interest in and lien on (i) the Collateral (as defined in proof of claim no. 69 filed by NNN in Case No. 10-43849-rfn11) owned by the Reorganized Debtors on the Effective Date, and (ii) the Bratton/Fair Tax Refunds, including, without limitation, any proceeds thereof; (d) be paid on a monthly basis *pro rata* from the $125,000 monthly distribution required to be made by Reorganized Majestic pursuant to Article 4.2(c) of the Plan; and (e) mature on the fifth (5th) anniversary of the first monthly distribution of $125,000 made pursuant to Article 4.2(c) of the Plan.<br><br>Within seven (7) Business Days of receipt of the Bratton/Fair Tax Refunds, but on a date no later than January 1, 2012, the Reorganized Debtors shall pay to NNN a cash distribution equal to the amount of the Bratton/Fair Tax Refunds (the "Refund Amount").<br><br>Upon NNN's receipt of the Refund Amount, the |

4 The Debtors and NNN/NRP have reached an agreement in principle regarding the treatment of the NRP Claim, but are continuing to negotiate the specific terms of the treatment of the NRP Claim. The treatment of the NRP Claim to be finally agreed to by the Debtors and NNN/NRP shall largely track the terms set forth in this Disclosure Statement. However, the specifics of certain of the final terms of the treatment of the NRP Claim may ultimately differ from the terms set forth in this Disclosure Statement.

| Class | Treatment |
|-------|-----------|
|  | Reorganized Debtors shall receive credit toward the amount due on the NRP Deficiency Note in the amount of $3,552,00 (the "<u>Credit</u>"), *provided, however,* that the Refund Amount is $2,400,000. |
|  | If the Refund Amount is an amount less than $2,400,000, then the Credit shall be reduced by $1.48 for each $1 (one dollar) that the Refund Amount equals an amount less than $2,400,000. For example, if the total Refund Amount, in fact, equals $2,000,000, then the Credit shall equal $2,960,000. This provision shall only apply to the Refund Amount and shall not be applicable to any other payments made by the Reorganized Debtors on account of the NRP Deficiency Note. |
|  | If the Refund Amount is an amount more than $2,400,000, then the Credit shall be increased by $1.48 for each $1 (one dollar) that the Refund Amount equals an amount more than $2,400,000. For example, if the Refund Amount, in fact, equals $3,000,000, then the Credit shall equal $4,440,000. This provision shall only apply to the Refund Amount and shall not be applicable to any other payments made by the Reorganized Debtors on account of the NRP Deficiency Note. |
|  | All amounts required to be paid by Reorganized Majestic pursuant to Article 4.2 of the Plan on account of the Rejection Claim held by Majestic Properties against Majestic arising as a result of Majestic's rejection of the lease of the Majestic Properties Lubbock Property shall be paid by Reorganized Majestic directly to NNN and all amounts so paid to NNN shall be credited against the amount then due on the NRP Deficiency Note. |
|  | Within three (3) Business Days of a Change of Control of Reorganized Majestic, the NRP Deficiency Note shall be paid in full. NRP shall have the exclusive right to waive the requirement that the NRP Deficiency Note be paid in full within three (3) Business Days of a Change of Control of Reorganized Majestic. |
|  | In the event that Article 4.2 of the Plan is modified or amended to improve the treatment of Allowed Class 2 Claims, a corresponding modification or amendment shall be made to provide for the same improvement in treatment of the Allowed Class 6 |

| Class | Treatment |
|---|---|
| | NRP Claim.<br><br>**Estimated Recovery: 100%** |
| **Class 7 – Leggett Estate Claim**<br><br>**Estimated Amount: $2,600,000**<br><br>**Total Holders: 1** | **Impaired**<br><br>Except to the extent that the Leggett Estate, John Bratton and Kyle Fair agree otherwise, the Leggett Estate Claim shall be paid and treated as follows:<br><br>The Leggett Estate Claim shall bear interest from and after the Effective Date until paid at the non-default contract rate of interest set forth in the Leggett Note.<br><br>The Leggett Estate shall receive distributions equal to one hundred percent (100%) of the Leggett Estate Claim as follows: (i) through seventy-two (72) monthly installment payments, with each of the first thirty-six (36) such installments being payments of interest only, and each of the final thirty-six (36) such installments including both interest and a principal payment of five thousand dollars ($5,000), with the first such installment being due and payable on the Initial Distribution Date, with a like installment being due and payable on the first day of each successive calendar month thereafter until each of the seventy-two (72) installment payments have been made; and (ii) on the first day of the calendar month immediately following the calendar month during which the seventy-second (72nd) installment payment is made, the remaining unpaid principal balance of the Leggett Estate Claim and any accrued and unpaid interest thereon shall be due and payable.<br><br>The Leggett Estate shall retain its Lien on the Interests in Majestic owned by John Bratton and Kyle Fair until the Leggett Estate Claim is paid in full.<br><br>All payments required to be made to the Leggett Estate shall be made by John Bratton and/or Kyle Fair.<br><br>John Bratton and Kyle Fair may, in the exercise of their discretion, accelerate the payment schedule as to the Leggett Estate Claim. John Bratton and |

| Class | Treatment |
|---|---|
| | Kyle Fair shall never have any obligation to accelerate the payment schedule as to the Leggett Estate Claim, but may do so on such terms and in such manner as they, in the exercise of their discretion, may deem appropriate.<br><br>**Estimated Recovery: 100%** |
| **Class 8 – Other Secured Claims Against John Bratton**<br><br>**Estimated Amount: $269,000**<br><br>**Total Holders: 1** | **Unimpaired**<br><br>Except to the extent that the holder of an Allowed Other Secured Claim against John Bratton agrees to less favorable treatment, each Allowed Other Secured Claim against John Bratton shall, on the Effective Date, be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim against John Bratton to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default. All Allowed Other Secured Claims against John Bratton that are not due and payable on or before the Effective Date shall, at John Bratton's option, be paid (a) in the ordinary course in accordance with the course of practice between John Bratton and such holder with respect to such Claim, or (b) by transfer of the Collateral securing such Claim to the holder of such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim. All payments on account of Allowed Class 8 Claims shall be made by John Bratton.<br><br>**Estimated Recovery: 100%** |
| **Class 9 – Other Secured Claims Against Kyle Fair and Suzanne Fair**<br><br>**Estimated Amount: $2,257,000**<br><br>**Total Holders: 4** | **Unimpaired**<br><br>Except to the extent that the holder of an Allowed Other Secured Claim against Kyle Fair and/or Suzanne Fair agrees to less favorable treatment, each Allowed Other Secured Claim against Kyle Fair and/or Suzanne Fair shall, on the Effective Date, be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim against Kyle Fair and/or Suzanne Fair to demand or |

| Class | Treatment |
|---|---|
| | receive payment of such Claim prior to its stated maturity from and after the occurrence of a default. All Allowed Other Secured Claims against Kyle Fair and/or Suzanne Fair that are not due and payable on or before the Effective Date shall, at Kyle Fair's and/or Suzanne Fair's option, be paid (a) in the ordinary course in accordance with the course of practice between Kyle Fair and/or Suzanne Fair and such holder with respect to such Claim, or (b) by transfer of the Collateral securing such Claim to the holder of such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim. All payments on account of Allowed Class 9 Claims shall be made by Kyle Fair and/or Suzanne Fair.<br><br>**Estimated Recovery: 100%** |
| **Class 10** – **Unsecured (General) Claims Against the Individual Debtors**<br><br>**Estimated Amount: $33,000**<br><br>**Estimated Number of Holders: 15** | **Impaired**<br><br>Holders of Allowed Unsecured (General) Claims against the Individual Debtors shall be paid and treated as follows:<br><br>All Allowed Class 10 Claims shall bear interest from and after the Effective Date until paid at the Plan Rate.<br><br>Each holder of an Allowed Class 10 Claim shall receive distributions equal to one hundred percent (100%) of such Allowed Claim in twenty-four (24) substantially equal monthly installment payments, each including both principal and interest. The first such installment shall be due and payable on the applicable Initial Distribution Date, with a like installment being due and payable on the first day of each successive calendar month thereafter until each such Allowed Class 10 Claim has been paid in full.<br><br>The Reorganized Individual Debtors may, in the exercise of their sole discretion, accelerate the payment schedule as to any Allowed Class 10 Claim. The Reorganized Individual Debtors shall never have any obligation to accelerate the payment schedule as to any such Class 10 Creditor, but may do so on a case-by-case basis, on such terms and in such manner as the Reorganized Individual Debtors, in the exercise of their sole discretion, may deem appropriate. |

| Class | Treatment |
|---|---|
| | The Reorganized Individual Debtors shall be jointly and severally responsible for making all payments required on account of Allowed Class 10 Claims.<br><br>**Estimated Recovery: 100%** |
| <u>Class 11 – Interests in the Debtors</u> | **Unimpaired**<br><br>Holders of Interests in the Debtors shall retain their Interests subject to the terms of the Plan. |

The total universe of Claims, as ultimately Allowed, may be greater or smaller than as reflected in the above analysis.

## II. EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11, the debtor-in-possession attempts to reorganize its business for the benefit of the debtor, its creditors, and other parties in interest. The present Chapter 11 Cases commenced with the filing of voluntary chapter 11 petitions by the Majestic Debtors on June 6, 2010, and the filing of voluntary chapter 11 petitions by the Individual Debtors on June 8, 2010.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. In the present Chapter 11 Cases, the Debtors have remained in possession of their properties and have continued to operate their businesses as debtors-in-possession.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, *inter alia,* for an automatic stay of all attempts to collect pre-petition claims from the debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the claims against and interests in the debtor. Generally, unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case (the "<u>Exclusive Period</u>"). However, section 1121(d) of the Bankruptcy Code permits the court to extend or reduce the Exclusive Period upon a showing of "cause." After the Exclusive Period has expired, a creditor or any other party in interest may file a plan, unless the debtor has filed a plan within the Exclusive Period, in which case, the debtor is generally given 60 additional

days (the "Solicitation Period") during which it may solicit acceptances of its plan. The Solicitation Period may also be extended or reduced by the court upon a showing of "cause."

## B.    Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In these Chapter 11 Cases, the Plan, as proposed by the Debtors, provides for 100% payment of unsecured claims and a restructuring and extension of certain secured indebtedness. Holders of Interests in the Debtors shall retain their Interests.

After a plan of reorganization has been filed, the holders of impaired claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against and Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

If all classes of claims and interests accept a plan of reorganization, the bankruptcy court may nonetheless still not confirm the plan unless the court independently determines that the requirements of section 1129 of the Bankruptcy Code have been satisfied. Section 1129 sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible." The "best interests of creditors" test generally requires that the value of the consideration to be distributed to the holders of claims and Interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.

The Debtors believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the "best interests of creditors" test and the "feasibility" requirement. The Debtors support confirmation of the Plan and urge all holders of impaired Claims to accept the Plan.

Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. At a minimum, however, the plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting in at least one class of impaired claims under the plan. The Bankruptcy Code also defines acceptance of the plan by a class of Interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voting. In the present case, only the holders of Claims or Interests who actually vote will be counted as either accepting or rejecting the Plan.

In addition, classes of claims or Interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or Interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or Interests of that class are modified in any way under the plan. However, if holders of the claims or Interests in a class do not receive or retain any property on account of such claims or Interests, then each such holder is deemed to have voted to reject the plan and does not actually cast a vote to accept or reject the plan.

Other Secured Claims against John Bratton, Other Secured Claims against Kyle Fair and Suzanne Fair, and Interests in the Debtors are not impaired under the Plan. All other Classes of Claims are impaired under the Plan and, therefore, each holder of a Claim in such other Classes is entitled to vote on the Plan.

The bankruptcy court may also confirm a plan of reorganization even though fewer than all the classes of impaired claims and interests accept it. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or interests, the proponents of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or Interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class of rejecting claims if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and Interests, that the holder of any claim or Interest that is junior to the claims or Interests of such class will not receive or retain on account of such junior claim or Interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive more than 100% of the amount of the claims in such class.

The Debtors believe that the Plan has been structured so that it will satisfy these requirements as to any rejecting Class of Claims, and can therefore be confirmed, if necessary, over the objection of any Classes of Claims. The Debtors, however, reserve the right to request confirmation of the Plan under the "cramdown" provisions of section 1129 of the Bankruptcy Code.

## III. THE DEBTORS AND THEIR BUSINESSES

**A.     The Debtors**

**1.     The Majestic Debtors**

Majestic is a Texas corporation, incorporated in 1955, that operates Texas retail stores for the sale of liquor, beer, wine and bar supplies. In May of 2004, John Bratton and Kyle Fair acquired ownership of Majestic. At the time of the acquisition, Majestic operated fourteen (14) retail stores and one (1) wholesale operation. Through a series of acquisitions, Majestic grew to forty-five (45) retail locations and one (1) wholesale location. As of September 30, 2009, the stores were located in the following areas:

| Area | No. of Stores |
| --- | --- |
| Dallas-Fort Worth | 16 |
| Hudson Oaks | 1 |
| Azle | 1 |
| Highland Village | 1 |
| East Texas | 9 |
| Austin | 1 |
| Roundrock | 1 |
| Lubbock | 10 |

| Granbury | 1 |
| Weatherford | 2 |
| Plainview | 2 |

Beginning shortly before the Petition Date and continuing postpetition, Majestic closed certain underperforming stores. The locations of the stores closed by Majestic postpetition are: five stores in Lubbock, two stores in Dallas, and one store each in the cities of Austin, Round Rock, Fort Worth, Cuney and Rusk. Currently, Majestic employs approximately 342 people, including 303 full-time employees and 39 part-time employees.

Majestic Properties is a Texas limited partnership. As of the Petition Date, Majestic Properties owned the Majestic Properties Lubbock Property and an additional three lots of land in Lubbock. Majestic Properties previously leased the Majestic Properties Lubbock Property to Majestic, at which Majestic operated two retail stores and its wholesale distribution business serving Lubbock County. Majestic has rejected the lease between it and Majestic Properties with respect to the Majestic Properties Lubbock Property. NNN has foreclosed its lien against the Majestic Properties Lubbock Property and acquired the Majestic Properties Lubbock Property via a credit bid at a foreclosure sale held on or about November 2, 2010. Majestic GP is the general partner of Majestic Properties and owns a 1% Interest in Majestic Properties.

Majestic Grapevine is a Texas limited partnership. As of the Petition Date, Majestic Grapevine owned the Cuney Property. Majestic Grapevine previously leased the Cuney Property to Majestic, at which Majestic operated a retail package liquor store. Majestic has rejected the lease between it and Majestic Grapevine with respect to the Cuney Property. If it has not done so already, Wells Fargo will foreclose its lien against the Cuney Property. Majestic GP II is the general partner of Majestic Grapevine and owns a 1% Interest in Majestic Grapevine.

### 2. The Individual Debtors

John Bratton owns 49% of the Interests in Majestic and is a Director and Vice-President of Majestic. Kyle Fair owns the remaining 51% of the Interests in Majestic and is also a Director and Vice-President of Majestic. John Bratton and Kyle Fair each own a 49.5% limited partnership Interest in both Majestic Properties and Majestic Grapevine. John Bratton and Kyle Fair each own a 50% membership Interest in both Majestic GP and Majestic GP II and John Bratton and Kyle Fair are each a Manager of both Majestic GP and Majestic GP II. Suzanne Fair is Kyle Fair's spouse.

### B. Majestic Debtors' Management

The current officers and directors of Majestic, and the annual salaries paid to each, are as follows:

| Name | Title | Annual Salary |
|------|-------|---------------|
| Ben Lanford | Director and President | $325,000 |
| John Bratton | Director and Vice-President | $240,000 |
| Kyle Fair | Director and Vice-President | $240,000 |

John Bratton and Kyle Fair are the Managers of Majestic GP, which is the general partner of

Majestic Properties. John Bratton and Kyle Fair are also the Managers of Majestic GP II, which is the general partner of Majestic Grapevine. Neither John Bratton nor Kyle Fair receive a salary from Majestic Properties, Majestic Grapevine, Majestic GP, or Majestic GP II.

The current officers and directors of the Majestic Debtors shall continue in such positions from and after the Effective Date. Thereafter, the officers and directors of the Reorganized Majestic Debtors shall be selected in accordance with the organizational documents of the Reorganized Majestic Debtors and applicable law. Notwithstanding the foregoing or anything to the contrary herein, the initial board of directors of Reorganized Majestic shall be expanded from three (3) members to five (5) members on the Effective Date. Reorganized Majestic's five (5) member board of directors shall be comprised of (a) the three current directors of Majestic and (b) two new directors who shall be selected by the Committee (the "Committee Board Members") prior to the Effective Date or as soon as practicable after the Effective Date. The Committee Board Members shall continue to serve on Reorganized Majestic's board of directors until all Allowed Class 2 Claims have been paid in full. As compensation for their service on Reorganized Majestic's board of directors, the Committee Board Members shall each receive an annual fee in an amount to be agreed upon by Majestic, the Committee and the Committee Board Members. Furthermore, notwithstanding the foregoing, prior to or on the Effective Date, Majestic and Ben Lanford shall execute an employment agreement which shall provide that Ben Lanford shall continue in his current capacity as Director and President of Majestic through February 1, 2012, *provided, however,* that such employment agreement shall contain a provision that, upon a Change of Control of Reorganized Majestic, such employment agreement shall terminate.

Unless otherwise ordered by the Bankruptcy Court, from and after the Effective Date the Reorganized Majestic Debtors' existing officers and directors shall be compensated at their current compensation levels. However, the salaries to be paid by Reorganized Majestic to John Bratton and Kyle Fair shall not be thereafter increased until all payments and distributions on account of Allowed Claims required under the Plan have been made, except that the salaries of John Bratton and Kyle Fair may be increased in March of each year to compensate for increases in the Consumer Price Index.

## C. Prepetition Financing Structure of the Debtors

As of the Petition Date, Majestic was a borrower under that certain Loan and Security Agreement dated April 27, 2009 (as amended and together with all related documents and agreements, the "F&M Secured Loan Documents"), by and between Majestic as borrower and F&M Bank as lender. John Bratton and Kyle Fair, in conjunction with the F&M Secured Loan Documents, each entered into a Guaranty Agreement whereby each guaranteed up to $3 million of the amount due under the F&M Secured Loan Documents. Under the F&M Secured Loan Documents, Majestic granted to F&M Bank security interests in and liens on various property of Majestic, including but not limited to all accounts, inventory and equipment. On April 12, 2010, Majestic and F&M Bank entered into a temporary forbearance agreement. On or about April 21, 2010, Majestic and F&M Bank entered into the First Amendment to the F&M Secured Loan Documents whereby F&M Bank agreed to temporarily increase Majestic's revolving loan limit under the F&M Secured Loan Documents. In connection with the First Amendment to the F&M Secured Loan Documents, Majestic executed a Temporary Increase Note in the original principal amount of $1 million to be repaid on May 14, 2010. John Bratton and Kyle Fair each executed a Guaranty to guarantee the full payment of the Temporary Increase Note. The total indebtedness under the F&M Secured Loan documents as of the Petition Date was approximately $13.4 million.

As of the Petition Date, Majestic Grapevine was a borrower under that certain Loan Agreement dated February 11, 2008 (together with all related documents and agreements, the

"Wells Fargo Secured Loan Documents"), by and between Majestic Grapevine as borrower and Century Bank, N.A. (predecessor in interest to Wells Fargo) as lender. In conjunction with the Wells Fargo Secured Loan Documents, John Bratton and Kyle Fair each entered into a Continuing Unconditional Guaranty whereby each guaranteed such indebtedness. Under the Wells Fargo Secured Loan Documents, Majestic Grapevine granted to Wells Fargo a security interest in and lien on the Cuney Property. If it has not done so already, Wells Fargo will foreclose its lien against the Cuney Property. The total indebtedness under the Wells Fargo Secured Loan documents as of the Petition Date was approximately $1 million.

As of the Petition Date, the Individual Debtors were indebted to NNN pursuant to that certain Promissory Note dated July 16, 2007 in the original principal amount of $14 million executed by the Individual Debtors payable to NRP, assignor of such indebtedness to NNN. In connection with such financing, Majestic Properties granted to NRP a security interest and lien on the Majestic Properties Lubbock Property. NNN, assignee of the security interest and lien on the Majestic Properties Lubbock Property, foreclosed such lien against the Majestic Properties Lubbock Property and acquired the Majestic Properties Lubbock Property via a credit bid at a foreclosure sale held on or about November 2, 2010. The total indebtedness owed by the Individual Debtors to NNN as of the Petition Date was approximately $8.7 million. Also in connection with such financing transaction, Majestic Properties is indebted to John Bratton and Kyle Fair pursuant to that certain Promissory Note dated July 16, 2007 in the original principal amount of $14 million, which indebtedness is unsecured.

As of the Petition Date, John Bratton and Kyle Fair were indebted to the Leggett Estate pursuant to that certain Promissory Note dated May 14, 2004 in the original principal amount of $4.6 million payable by John Bratton and Kyle Fair to Helen Leggett. John Bratton and Kyle Fair granted a security interest in and lien on their Interests in Majestic to secure payment of such Promissory Note pursuant to a Pledge Agreement dated May 14, 2004. The total Indebtedness owed by John Bratton and Kyle Fair to the Leggett Estate as of the Petition Date was approximately $2.6 million.

## IV. FINANCIAL PROJECTIONS AND ASSUMPTIONS / FEASIBILITY

Majestic's long term business plan and the underlying operating projections and assumptions serve as the basis for the Plan. The Debtors believe that the assumptions that underlie the projections are reasonable under the circumstances and that achieving the projections set forth herein will maximize the value of Majestic's business. Majestic's operating projections for its fiscal years 2011-2016 are attached to this Disclosure Statement as **Exhibit "B"**. Majestic's fiscal year runs October 1 through September 30. Majestic's fiscal year 2010 began October 1, 2009.

The Bankruptcy Code conditions confirmation of a plan of reorganization on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Debtors have analyzed the capacity of each Debtor to service its obligations under the Plan. Based upon this analysis and the supporting projections, the Debtors believe they will be able to make all payments and distributions required under the Plan.

## V. THE CHAPTER 11 CASES

### A. Factors Leading To Filing of the Chapter 11 Cases

In May of 2009, voters in Lubbock County, Texas approved two ballot propositions expanding packaged alcohol sales in the county. Prior to this local option election, alcohol sales

were limited to a small section of the southeast part of Lubbock County on U.S. Highway 87 universally known as "The Strip." Majestic operated five (5) retail stores and its wholesale distribution business for Lubbock County on The Strip.

Following the expansion of alcohol sales in Lubbock County, Majestic's sales dramatically decreased at its locations on The Strip, turning once profitable locations into unprofitable locations. This decrease in overall sales in Lubbock County caused Majestic to close the majority of its retail operations on The Strip shortly before and immediately after the Petition Date. Additionally, the downturn in the economy since 2008, coupled with the overall decline in consumer spending, has affected Majestic's sales and made certain other of its locations unprofitable.

## B. Commencement of the Chapter 11 Cases

On June 6, 2010, the Majestic Debtors each filed a voluntary petition for protection under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. The chapter 11 bankruptcy cases of the Individual Debtors were thereafter commenced by the filing of a voluntary petition by John Bratton, and by the filing of a voluntary petition jointly by Kyle Fair and Suzanne Fair, on June 8, 2010. Each of the Chapter 11 Cases is jointly administered under Case No. 10-43849-rfn11 and presided over by the Honorable Russell F. Nelms, United States Bankruptcy Judge.

## C. The Debtors' Professionals

The following is a list of each of the Professionals that has been employed by the Debtors in the Chapter 11 Cases, with a description of the role of each such Professional and the specific Debtors employing such Professional:

| Professional | Employed by | Role of Professional |
|---|---|---|
| Forshey & Prostok, LLP | Majestic, Majestic Grapevine and Majestic GP II | Lead bankruptcy counsel |
| Goodrich Postnikoff & Albertson, LLP | Majestic Properties and Majestic GP | Lead bankruptcy counsel |
| Shannon, Gracey, Ratliff & Miller, LLP | John Bratton, Kyle Fair and Suzanne Fair | Lead bankruptcy counsel |
| Focus Management Group USA, Inc. | All Debtors | Financial advisors |
| J Taylor & Associates, LLC | All Debtors | Accountants |
| Tiblets & Associates, P.C. | Majestic | Ordinary course accountants |
| Vink Teague & Associates, LLLP | Majestic | Accounts (for purpose of conducting annual certified audit of financial statements) |
| Sussman & Moore, LLP | All Debtors | Special counsel |

| Prime Locations, LLC | Majestic | Lease consultant |
| The Margulies Communications Group | Majestic | Public relations consultant |

## D.    Formation and Representation of the Committee

On or about June 21, 2010, the United States Trustee appointed the Committee. The Committee retained the law firm of Munsch Hardt Kopf & Harr, PC as its counsel. In addition, the Committee retained Walker Nell Partners, Inc. as its financial advisors. The current members of the Committee are: (a) A&R Inventory, (b) Pollock Paper, and (c) Coca-Cola Enterprises, Inc.

## E.    Professional Fees and Expenses

On July 21, 2010, the Bankruptcy Court entered an *Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Chapter 11 Professionals and Committee Members* (the "Fee Procedures Order") (Docket No. 176). Pursuant to the Fee Procedures Order, Professionals employed by the Debtors and the Committee are required to comply with certain procedures regarding Professional fees and expenses to be charged to the Debtors' bankruptcy estates. Such Professionals have complied with the procedures and have submitted invoices to the Debtors and other parties required to be served with such invoices under the Fee Procedures Order. Based on the invoices submitted pursuant to the Fee Procedures Order, the total amount of Professional fees and expenses incurred by Professionals employed by the Debtors and the Committee, for the period beginning on the Petition Date and ending on September 30, 2010, is in excess of $850,000. Under the Fee Procedures Order, the Debtors have been authorized to pay, on an interim basis, 80% of the total amount of Professional fees and 100% of the out-of-pocket expenses incurred by the Professionals, absent objection to the invoices submitted. Professionals subject to the terms of the Fee Procedures Order shall continue to comply with the same and submit invoices in accordance with the procedures established.

In addition to fees and expenses incurred by Professionals employed by the Debtors and the Committee, Majestic's estate may be liable, pursuant to section 506(b) of the Bankruptcy Code, for payment of certain postpetition fees and expenses incurred by professionals retained by oversecured creditors, to the extent such fees and expenses are determined to be reasonable by the Bankruptcy Court. F&M Bank has incurred approximately $420,000 in attorneys fees and expenses during the period beginning on the Petition Date and ending on September 30, 2010. Such attorneys fees and expenses, as well as any additional attorneys fees and expenses incurred by F&M Bank from October 1, 2010 through December 31, 2010, will be paid in accordance with the terms of the F&M Bank Exit Facility.

## F.    Continuation of Business after the Petition Date

Since the Petition Date, the Debtors have continued to operate their businesses and manage their property as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors have sought Bankruptcy Court approval for all transactions that were outside the ordinary course of their businesses. As discussed below, the Debtors also sought and obtained authority from the Bankruptcy Court during the period immediately following the Petition Date with respect to a number of matters deemed by the Debtors to be essential to their smooth and efficient transition into chapter 11 and the stabilization of their operations.

1.   **Majestic's Use of Cash Collateral**

On the Petition Date, Majestic filed an *Expedited Motion for the Use of Cash Collateral and to Provide Adequate Protection to Secured Lender* (the "Cash Collateral Motion") (Docket No. 13)[5] seeking authority to use cash, including cash collateral of F&M Bank, on an interim basis in accordance with a set cash collateral budget, pending final approval of the Cash Collateral Motion.  The Bankruptcy Court entered interim orders on the Cash Collateral Motion allowing Majestic to use the cash collateral of F&M Bank in accordance with set cash collateral budgets on: June 10, 2010 (see Docket No. 95); July 1, 2010 (see Docket No. 123); August 10, 2010 (see Docket No. 221); September 3, 2010 (see Docket No. 298); October 27, 2010 (see Docket No. 419); and November 5, 2010 (see Docket No. 459) (collectively, the "Interim Cash Collateral Orders").  In the Interim Cash Collateral Orders, the Bankruptcy Court granted replacement liens to F&M Bank, to the extent of any diminution in the value of F&M Bank's collateral resulting from Majestic's use of cash or cash collateral, on: (a) prepetition F&M Bank collateral; (b) property acquired by Majestic after the Petition Date which is of the same nature, kind and character as the prepetition F&M Bank collateral, and all proceeds and products thereof; and (c) all existing or after acquired property of Majestic.  The Interim Cash Collateral Orders also authorized Majestic to make payments of interest due under the F&M Secured Loan Documents to F&M Bank on a monthly basis as adequate protection.

2.   **Business Operations and Employee-Related Relief Immediately Following the Petition Date**

Within one week of the Petition Date, the Bankruptcy Court granted Majestic "first day" relief, including among other things, (a) authorizing Majestic to continue using its existing cash management system and certain bank accounts; (b) authorizing Majestic to pay certain prepetition obligations owing to Majestic's employees; (c) authorizing Majestic to pay certain prepetition obligations owing to critical vendors; (d) prohibiting Majestic's utility companies from altering, refusing or discontinuing service; (e) authorizing Majestic to honor certain prepetition obligations to its customers; and (f) authorizing Majestic to continue performing, on an interim basis, under certain contracts necessary to facilitate credit card transactions with Majestic's customers.

**G.   Schedules and General Bar Dates**

After having received extensions from the Bankruptcy Court, the Debtors filed their Schedules and, in certain cases amended certain of their Schedules, on the following dates:

| Debtor | Date Schedules Filed | Date Schedules Amended |
|---|---|---|
| Majestic | July 9, 2010 (see Case No. 10-43849-rfn11, Docket Nos. 144 and 145) | August 26, 2010 (see Case No. 10-43849-rfn11, Docket No. 265) |
| Majestic Properties | June 18, 2010 (see Case No. 10-43850-rfn11, Docket Nos. 18 and 19) | July 20, 2010 (see Case No. 10-43850-rfn11, Docket Nos. 25 and 26) |

---

[5] Unless otherwise indicated, all references to the "Docket" herein are to the docket maintained in Case No. 10-43849-rfn11.

| Majestic Grapevine | July 9, 2010 (see Case No. 10-43851-rfn11, Docket Nos. 14 and 15) | July 26, 2010 (see Case No. 10-43851-rfn11, Docket Nos. 19 and 20 and Case No. 10-43849-rfn11, Docket Nos. 182 and 183) |
| --- | --- | --- |
| Majestic GP | June 18, 2010 (see Case No. 10-43852-rfn11, Docket Nos. 16 and 17) | July 20, 2010 (see Case No. 10-43852-rfn11, Docket No. 24) |
| Majestic GP II | July 9, 2010 (see Case No. 10-43853-rfn11, Docket Nos. 13 and 14) | July 26, 2010 see Case No. 10-43853-rfn11, Docket No. 18 and Case No. 10-43849-rfn11, Docket No. 181) |
| John Bratton | July 9, 2010 see Case No. 10-43883-rfn11, Docket Nos. 27 and 28) | no amendments filed |
| Kyle Fair and Suzanne Fair | July 9, 2010 (see Case No. 10-43885-rfn11, Docket Nos. 26 and 27) | no amendments filed |

Pursuant to a *Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines* entered in each of the Chapter 11 Cases, October 14, 2010 was fixed as the deadline for all holders of alleged Claims against the Debtors to file proofs of claim against the Debtors. Majestic determined that certain creditors identified in its Schedules may not have been served with a copy of the *Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines*. Therefore, Majestic filed a motion seeking an order from the Bankruptcy Court extending the proof of claim bar date as to such creditors. Such motion was granted pursuant to an *Order* entered by the Bankruptcy Court on November 19, 2010, which order extended the proof of claim bar date to December 31, 2010 as to such specific creditors identified in the motion.

## H.    Operating Information During Pendency of the Chapter 11 Cases

The Debtors file monthly operating reports with the Bankruptcy Court and the United States Trustee. Copies of the filed monthly operating reports are available for inspection and copying at the office of the Clerk of the Bankruptcy Court. Copies of the most recently filed monthly operating reports for each of the Debtors are attached hereto as **Exhibit "C"**.

## I.    Matters Relating to Executory Contracts, Unexpired Leases, and Bar Dates for Rejection Claims

Section 365 of the Bankruptcy Code grants a debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. Section 365(d)(4) of the Bankruptcy Code provides that if a debtor does not assume or reject an unexpired lease of nonresidential real property under which a debtor is the lessee (i) within 120 days after the petition date (the "365(d)(4) Deadline"), (ii) within an additional 90-day period as the bankruptcy court, for cause, may allow, or (iii) within such additional time as the bankruptcy court may permit with the consent of the landlord of the leased premises, then such lease is deemed rejected.

### 1.    Leases Rejected by Majestic and Rejection Claim Bar Dates

On the Petition Date, Majestic filed a motion seeking Bankruptcy Court approval to reject ten unexpired leases of nonresidential real property at which Majestic operated, or previously

operated, retail stores, which leases Majestic determined to be burdensome to its estate. The Bankruptcy Court approved the rejection of such leases by order entered on June 29, 2010 (Docket No. 113). Pursuant to a separate order entered by the Bankruptcy Court on September 15, 2010 (Docket No. 318), the bar date for the landlords to file any Rejection Claims arising out of Majestic's rejection of the ten leases was October 15, 2010. Among such rejected leases were the leases with respect to Majestic's five locations on The Strip in Lubbock, Texas, including a lease of the Majestic Properties Lubbock Property. Majestic vacated each the premises with respect to the rejected leases, except for the lease relating to the Majestic Properties Lubbock Property, on or before July 31, 2010. With respect to the Majestic Properties Lubbock Property, Majestic continued to occupy the premises until it could transition its Lubbock wholesale distribution business to a new location, as described below. From and after the Petition Date, Majestic has paid rent for its continued use of the Majestic Properties Lubbock Property at an agreed upon rate significantly lower than the rental rate set forth in the rejected lease for such property. Majestic completely vacated the Majestic Properties Lubbock Property on or about November 2, 2010.

On August 24, 2010, Majestic filed a motion seeking Bankruptcy Court approval to reject the unexpired lease between it and Majestic Grapevine with respect to the Cuney Property. The Bankruptcy Court approved the rejection of the lease by order entered on September 14, 2010 (Docket No. 313). Pursuant to such order, any Rejection Claim by Majestic Grapevine was due by no later than October 14, 2010.

On September 13, 2010, Majestic filed a motion seeking Bankruptcy Court approval to reject an unexpired lease with respect to property in Rusk, Texas at which Majestic operated a retail beer and wine store. Majestic ceased all operations at such location and vacated the premises by September 25, 2010. The Bankruptcy Court approved the rejection of such lease by order entered on October 26, 2010 (Docket No. 404). Pursuant to such order, the deadline by which the landlord must file any Rejection Claim arising out of the rejection of such lease is that date which is 30 days from the date of entry of the order by the Bankruptcy Court approving the rejection of the lease.

On November 23, 2010, Majestic filed (a) a motion seeking Bankruptcy Court approval to reject an unexpired lease with respect to property located in Big Sandy, Texas at which Majestic operated a gas station/convenience store and a retail beer and wine store, and (b) a motion seeking Bankruptcy Court approval to reject an unexpired lease with respect to property located in Coffee City, Texas at which Majestic operated a retail package liquor store. Majestic ceased all operations at such locations prior to November 25, 2010 and will have completely vacated the premises by November 30, 2010. Majestic, in its motions, has requested that the Bankruptcy Court require the landlords with respect to such leases to file any claims arising out of the rejection of such leases by a date that is 30 days from the date of entry of orders by the Bankruptcy Court approving the rejection of such leases.

Also on November 23, 2010, Majestic filed a motion seeking Bankruptcy Court approval to reject an unexpired lease with respect to property located in Dallas, Texas at which Majestic operated a warehouse. Majestic will have fully vacated the premises by December 31, 2010. Majestic, in its motion, has requested that the Bankruptcy Court require the landlord with respect to such lease to file any claim arising out of the rejection of such lease by a date that is 30 days from the date of entry of an order by the Bankruptcy Court approving the rejection of such lease.

## 2. Extension of 365(d)(4) Deadline Obtained with Respect to Remaining Leases of Majestic and Majestic Properties

On July 12, 2010, Majestic and Majestic Properties filed a joint motion seeking an extension a 90 day extension of the 365(d)(4) Deadline. The Bankruptcy Court granted such motion by order entered on September 14, 2010 (Docket No. 316) and extended the 365(d)(4) Deadline to January 2, 2011 with respect to any unexpired leases of nonresidential real property under which Majestic or Majestic Properties is lessee.

## 3. Hebron and Dalworthington Gardens Expansion Projects

Prior to the Petition Date, Majestic Properties commenced two build-to-suit projects, one in Hebron, Texas (the "Hebron Project") and the other in Dalworthington Gardens, Texas (the "Dalworthington Project" and, together with the Hebron Project, the "Expansion Projects"). The Expansion Projects were entered into for the purpose of constructing two commercial buildings at which Majestic would open new retail package liquor stores. Majestic projects that the new stores in Hebron and Dalworthington Gardens will be profitable and thereby enhance its ability to successfully reorganize. Majestic Properties is responsible for funding the costs of construction of the buildings pursuant to two construction contracts with Scott & Reid General Contractors, Inc. ("Scott & Reid"). In connection with the Expansion Projects, Majestic entered into a lease with each of the owners of the land on which the buildings were to be constructed, pursuant to which Majestic would operate the new stores upon completion of the Expansion Projects.

Majestic Properties and Majestic filed joint motions on June 10, 2010 seeking authority to assume the construction contracts with Scott & Reid with respect to the Expansion Projects. F&M Bank objected to both motions. The Bankruptcy Court has conducted multiple hearings on the motions and has entered multiple interim orders granting partial relief on the motions.

With respect to the Hebron Project, The Bankruptcy Court entered orders on July 9, 2010 and August 17, 2010 (Docket Nos. 142 and 241) authorizing Majestic Properties to make progress and retainage payments to Scott & Reid under the construction contract. The payments made in accordance with such orders fully satisfied all amounts due to Scott & Reid under the construction contract. The Hebron Project has been completed and Majestic commenced retail operations at the new Hebron location in late June, 2010. Thus, while the Bankruptcy Court's orders did not formally approve assumption of the construction contract, such orders allowed for all payments owing under the construction contract to be made to Scott & Reid necessary to bring the Hebron Project to completion.

With respect to the Dalworthington Gardens Project, the Bankruptcy Court entered orders on July 9, 2010, August 17, 2010, October 6, 2010 and November 17, 2010 (Docket Nos. 141, 242, 356 and 484) authorizing Majestic Properties to make progress and retainage payments to Scott & Reid under the construction contract. The payments made in accordance with such orders fully satisfied all amounts due to Scott & Reid under the construction contract. The Dalworthington Project has been completed and Majestic commenced retail operations at the new Dalworthington Gardens location on October 13, 2010. Thus, while the Bankruptcy Court's orders did not formally approve assumption of the construction contract, such orders allowed for all payments owing under the construction contract to be made to Scott & Reid necessary to bring the Dalworthington Gardens Project to completion.

Also with respect to the Expansion Projects, Majestic filed two motions on the Petition Date seeking approval of the assumption of the lease agreements between Majestic and the

landowners with respect to the new locations being constructed. While Majestic has not yet obtained Bankruptcy Court approval to assume such leases, Majestic has remained current on all postpetition lease payments owing to the landowners. Majestic will seek final approval of assumption of such leases prior to expiration of the extended 365(d)(4) Deadline and hearings on such motions are scheduled for December 21, 2010.

## J. Preservation of Majestic's Lubbock Wholesale Distribution Business

In addition to operating retail stores in Lubbock, Texas, Majestic conducts wholesale distribution operations and is a leading supplier of alcoholic beverages to various permit holders in Lubbock County, such as bars and restaurants (the "Lubbock Wholesale Business"). Prior to and following the Petition Date, Majestic conducted its Lubbock Wholesale Business out of the Majestic Properties Lubbock Property.

Having determined to reject the lease for the Majestic Properties Lubbock Property, it became necessary for Majestic to identify a new location at which to conduct its Lubbock Wholesale Business, as none of Majestic's remaining stores in Lubbock contain enough free space to accommodate the Lubbock Wholesale Business. Majestic considered a number of properties and ultimately agreed to the terms of a lease with Westco Industries, LP ("Westco") for use of a warehouse. Majestic chose the Westco property because (a) the agreed upon rental rate is significantly less than the rent that was required under the lease with Majestic Properties for the Majestic Properties Lubbock Property, (b) the Westco property will fully accommodate the Lubbock Wholesale Business and (c) the Westco property will also provide additional storage space. The additional storage space will allow Majestic to make certain bulk purchases, at reduced prices, of alcoholic beverages that can then be distributed to Majestic's remaining retail stores in Lubbock, thereby increasing the profitability of Majestic's retail operations in the area as well.

Majestic filed a motion on July 12, 2010 seeking authorization from the Bankruptcy Court to enter into the new lease with Westco. F&M Bank objected to the motion and the Bankruptcy Court conducted a hearing on the motion on August 9, 2010. The Bankruptcy Court overruled the objection of F&M Bank and entered an order on August 18, 2010 (Docket No. 247) authorizing Majestic to enter into the lease with Westco. Majestic fully vacated the Majestic Properties Lubbock Property on or about November 2, 2010 and has fully transitioned its Lubbock Wholesale Business to the Westco property.

## K. Exclusivity

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, a debtor has (a) 120 days after the petition date within which to file its plan of reorganization (the "Filing Period"), and (b) 180 days after the petition date to solicit acceptances of its timely filed plan of reorganization (the "Solicitation Period") before other parties in interest are permitted to file plans. Prior to expiration of the Filing Period, the Debtors filed a *Joint Chapter 11 Plan of Reorganization for Majestic Liquor Stores, Inc. and its Affiliated Debtors* (Docket No. 348). Unless the Bankruptcy Court grants an extension, the Solicitation Period will expire after December 3, 2010.

On August 9, 2010, with approximately half of the Filing Period still remaining, F&M Bank filed a motion (the "Exclusivity Termination Motion") requesting the Bankruptcy Court to terminate the Debtors' exclusive Filing Period immediately. F&M Bank requested such relief so that it would be permitted to file its own plan of reorganization, which plan contemplated a sale of substantially all of Majestic's assets to one of its competitors – Centennial. The Debtors

believed that F&M Bank's proposed plan would not result in meaningful distributions to unsecured Creditors and objected to the Exclusivity Termination Motion. The Exclusivity Termination Motion was ultimately withdrawn by F&M Bank on November 5, 2010, as a result of the agreement reached between Majestic and F&M Bank for F&M Bank to provide Majestic with exit financing in the form of the F&M Bank Exit Facility.

On November 2, 2010, Majestic, Majestic Grapevine and Majestic GP II filed a motion (the "Exclusivity Extension Motion") requesting the Bankruptcy Court to extend the Solicitation Period to February 28, 2011. The Exclusivity Extension Motion was joined in by the other Debtors. Based on the conditions of the F&M Bank Exit Facility that the Debtors obtain confirmation of the Plan by December 31, 2010 and that the Effective Date of the Plan occur by no later than December 31, 2010, the Debtors now no longer anticipate that an extension of the Solicitation Period is required. Nevertheless, the Bankruptcy Court conducted a hearing on the Exclusivity Extension Motion on November 29, 2010 and granted the Exclusivity Extension Motion as to all parties and persons other than the Committee, extending the Solicitation Period to February 28, 2011.

Pursuant to a *Stipulation* (Docket No. 444) between Majestic and the Committee filed with the Bankruptcy Court on November 1, 2010, Majestic agreed, subject to the Committee supporting the Exclusivity Extension Motion, that neither Majestic nor any of its affiliated Debtors will seek an extension of exclusivity as to the Committee and that the Solicitation Period would terminate as to the Committee on December 3, 2010. Consequently, the order submitted to the Bankruptcy Court granting the Exclusivity Extension Motion provides that the extension of the Solicitation Period does not apply to the Committee.

## L. The F&M Bank Exit Facility

Since the Petition Date, Majestic has sought a lender to provide debtor in possession and/or exit financing. Majestic received interest from a number of potential lenders, and engaged in extensive negotiations for debtor in possession financing from Wells Fargo Business Credit. However, Majestic and Wells Fargo Business Credit were unable to agree on terms for a debtor in possession facility.

More recently in these cases, Majestic and F&M Bank entered into negotiations for potential exit financing to be provided by F&M Bank. Such negotiations resulted in an agreement between Majestic and F&M Bank for F&M Bank to provide exit financing to Majestic in the form of the F&M Bank Exit Facility. The principal terms of the F&M Bank Exit Facility are described in Exhibit "A" to the Plan. The Debtors believe that entering into the F&M Bank Exit Facility is in the best interests of their estates and creditors, and that the exit financing to be provided by F&M Bank will provide Majestic with the working capital needed to operate successfully post-confirmation and meet its obligations under the Plan.

## M. Anticipated Post-Confirmation Future of the Majestic Debtors

Post-confirmation, Majestic will continue to operate its business as a going concern. When and as appropriate, Majestic will also continue to seek out opportunities to expand its business through opening new retail stores. Future expansion projects will be funded, at least in part, by Majestic Properties with funds held in the Majestic Properties Savings Account.

Post-confirmation, Majestic Properties will continue as a going concern. Majestic Properties, through the use of funds held in the Majestic Properties Savings Account, will serve

as a vehicle to facilitate future development and expansion of Majestic's business. The funds held in the Majestic Properties Savings Account may be used for purposes which include, but are not limited to, funding finish out expenses necessary to outfit and prepare new lease locations for commencement of retail operations by Reorganized Majestic at such new locations. Majestic GP will continue, post-confirmation, to act as the general partner of Majestic Properties.

Post-confirmation, neither Majestic Grapevine, nor its general partner Majestic GP II, will engage in business.

## N.    Preservation of NOLs

Majestic shall preserve all net operating loss carry-forwards under the Plan for the purposes of the Bratton/Fair Tax Refunds and for future utilization by Majestic to offset taxable income resulting from future operations.

## O.    Collectability of Accounts Receivable

Majestic averages only approximately $100,000 in outstanding accounts receivable on a monthly basis, as the vast majority of Majestic's business is generated by cash and credit card sales with its retail customers. The majority of Majestic's accounts receivable arise from Majestic's Lubbock Wholesale Business. Majestic estimates that the percentage of its accounts receivable that are not collectable is approximately 3%. The high rate of collectability of Majestic's accounts receivable is due in large part to the fact that, if any of the customers with respect to the Lubbock Wholesale Business fail to timely pay their debts, Majestic will report such delinquencies to the Texas Alcoholic Beverage Commission (the "TABC"). A customer that is reported as delinquent to the TABC is placed on a TABC "blacklist" and is thereafter prohibited from making purchases of alcoholic beverages from any supplier until the delinquency is cured.

## P.    Projected Avoidance Action Recoveries

The Majestic Properties Avoidance Claim is a cause of action that Majestic could potentially assert against Majestic Properties under section 547 of the Bankruptcy Code to recover a transfer of $900,000 made by Majestic to Majestic Properties on May 24, 2010. The $900,000 transfer made by Majestic to Majestic Properties was in repayment of two short term loans made on May 18, 2010 and May 19, 2010, in the respective amounts of $400,000 and $500,000, by Majestic Properties to Majestic. The Majestic Properties Avoidance Claim shall be compromised between Majestic and Majestic Properties based on the agreement of Majestic Properties to utilize funds held in the Majestic Properties Savings Account to fund future expansion and development of Majestic's business, as set forth in Article 6.5 of the Plan. The balance of the Majestic Properties Savings Account is currently approximately $570,000.

John Bratton and Kyle Fair each received over $1,000,000 in distributions from Majestic within the twelve (12) months immediately preceding the Petition Date. Some of the funds so distributed were distributed to allow John Bratton and Kyle Fair to pay income taxes which John Bratton and Kyle Fair were required to pay based on Majestic's status as a pass-through entity for tax purposes. Majestic may possess Avoidance Actions against John Bratton and Kyle Fair on account of such distributions. However, the Plan does not contemplate that Majestic shall prosecute any Avoidance Actions against either John Bratton or Kyle Fair. Pursuant to Article 12.2 of the Plan, any such Avoidance Actions by Majestic against John Bratton or Kyle Fair shall be released.

Although all rights with respect to all other Avoidance Actions are preserved under the Plan, the Plan does not contemplate the prosecution of any Avoidance Actions against any Persons. Furthermore, in connection with the F&M Bank Exit Facility, F&M Bank will receive a release of any and all claims that may be possessed by the Debtors against F&M Bank.

## VI. LITIGATION INVOLVING THE DEBTORS

### A.     Litigation Against the Debtors

No litigation was pending against any of the Debtors as of the Petition Date and no litigation against any of the Debtors has been commenced postpetition.

### B.     Potential Litigation by the Debtors

#### 1.     Causes of Action Against F&M Bank and Centennial

Majestic may have claims and causes of action against F&M Bank, Centennial, and/or other Persons, if any, involved in the communications and negotiations that led to the filing of F&M Bank's Exclusivity Termination Motion by which F&M Bank sought to propose a plan of reorganization under which substantially all of Majestic's assets would be sold to Centennial. In connection with the F&M Bank Exit Facility, Majestic will grant a release to F&M Bank of any such claims and causes of action that Majestic may possess. Majestic will also grant a release to Centennial of any such claims and causes of action Majestic may possess.

#### 2.     Additional Litigation

Except as expressly provided in the Plan, nothing contained in the Disclosure Statement, the Plan or the Confirmation Order shall waive, relinquish, release or impair the Reorganized Debtors' right to object to any Claim.

The Reorganized Debtors will retain all rights pursuant to section 505 of the Bankruptcy Code as to any Tax Claim, including but not limited to the rights of John Bratton, Kyle Fair and Suzanne Fair to pursue the Bratton/Fair Tax Refunds pursuant to section 505 of the Bankruptcy Code.

Except as expressly set forth in the Plan, all Causes of Action (including all Avoidance Actions), claims, counterclaims, defenses and rights of offset or recoupment belonging to any of the Debtors shall, upon the occurrence of the Effective Date, be retained by, received by and vested in the Reorganized Debtors for the benefit of the Debtors and the Debtors' estates. Except as expressly set forth in the Plan, the rights of the Reorganized Debtors to commence, prosecute or settle such Causes of Action, respectively, shall be preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors will not pursue any and all available Causes of Action (including all Avoidance Actions) against them. The Debtors and their estates expressly reserve all rights to prosecute any and all Causes of Action (including all Avoidance Actions) against any Person, except as otherwise provided in the Plan.** Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtors expressly reserve all Causes of Action (including all Avoidance Actions) for later adjudication, and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata,

collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

## VII. THE PLAN

**THE FOLLOWING IS A SUMMARY OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH THE CONSUMMATION OF THE PLAN. THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN. THE FOLLOWING SUMMARY IS COMPLETELY QUALIFIED BY THE TERMS OF THE PLAN. IN THE EVENT OF ANY CONFLICT BETWEEN THE FOLLOWING SUMMARY AND THE PLAN, THE PLAN WILL CONTROL.**

### A.      Classification and Treatment Summary

The Plan classifies the various Claims against and Interests in the Debtors. These Classes take into account the different nature and priority of Claims against and Interests in the Debtors. In addition, in accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified for purposes of voting under the Plan. Rather, all such Claims are treated separately as unclassified Claims.

#### 1.      Unclassified Claims Against the Debtor

Unclassified Claims against the Debtors consist of Administrative Expense Claims and Priority Tax Claims. An Administrative Expense Claim is a Claim based on any cost or expense of administration of the Chapter 11 Cases allowed under subsections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estates of the Debtors, any actual and necessary expenses of operating the businesses of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under section 1930 of title 28 of the United States Code.

Administrative Expense Claims include both ordinary postpetition business expenses and Claims attributable to Professionals. Trade debt will be paid in the ordinary course of business. Fees and expenses owed to Professionals are payable upon the Allowance of an appropriate fee application.

##### a.      Treatment of Administrative Expense Claims

Each holder of an Allowed Administrative Expense Claim shall receive the amount of such holder's Allowed Administrative Expense Claim (i) in one cash payment on the earlier of the Effective Date or the tenth (10th) Business Day after such Claim becomes an Allowed Claim, or (ii) in accordance with such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtors or ordered by the Bankruptcy Court.

Unless the Bankruptcy Court orders to the contrary or the Reorganized Debtors agree to the contrary in writing, the holder of a Claim for an Administrative Expense, other than (i) such a Claim by a Professional, (ii) a liability incurred and payable after the Petition Date in the ordinary course of business by a Debtor, or (iii) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve upon the Reorganized Debtors, the Committee, and the United States Trustee, a written notice of such Claim for an Administrative Expense within thirty (30) days after the Effective Date. Such notice must include at a minimum: (A) the name of the Debtor(s) which are purported to be liable for such Claim, (B) the name, address, telephone number and fax number (if applicable) of the holder of such Claim, (C) the amount of such Claim, and (D) the basis of such Claim (including any documentation evidencing or supporting such Claim). **THE FAILURE TO FILE A PROOF OF ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE AND THE FAILURE TO SERVE SUCH NOTICE TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED, DISALLOWED AND DISCHARGED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT.**

An Administrative Expense Claim with respect to which notice has been properly filed and served pursuant to Article 3.2(b) of the Plan shall become an Allowed Administrative Expense Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Expense Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 30-day period (or any extension thereof), the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.

The above procedures shall not apply to Professionals, who shall file and submit a final fee application to the Bankruptcy Court no later than sixty (60) days after the Effective Date. An Administrative Expense Claim of a Professional in respect of which a final fee application has been properly filed and served shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order. Professional fees and expenses of any Professional retained by the Reorganized Debtors and incurred on or after the Effective Date may be paid without necessity of application to or order by the Bankruptcy Court.

### b. Treatment of Priority Tax Claims

Unless otherwise agreed with a holder of an Allowed Priority Tax Claim, each of the Debtors, in their sole discretion, may choose whether Allowed Priority Tax Claims will be paid either: (i) in cash, in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest from and after the Effective Date at the applicable statutory rate of interest determined under applicable nonbankruptcy law during the month in which the Plan is confirmed, without penalties, and paid in regular quarterly installments of equal amount over a period not exceeding four (4) years from the Petition Date; or (ii) in full in cash on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim. The Debtors reserve the right to prepay, without penalty, at any time under option (i) above.

### c. Treatment of United States Trustee's Fees

Trustee's Fees. All quarterly United States Trustee's fees pursuant to 28 U.S.C. section 1930(a)(6) shall be paid as of the Effective Date and thereafter as the same may become due.

### 2. Classified Claims and Interests

Classified Claims and Interests shall receive the treatment as described in Article IV of the Plan, which treatment is summarized in the table set forth in Article I.B of this Disclosure Statement above.

## B. Acceptance or Rejection of the Plan

Each impaired Class of Claims or Interests shall be entitled to vote separately to accept or reject the Plan. Any unimpaired Class is deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. An impaired Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that has voted on the Plan. Article 5.3 of the Plan constitutes a request by the Debtors as proponents of the Plan, pursuant to section 1129(b), that the Bankruptcy Court confirm the Plan notwithstanding any failure to satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code.

## C. Means of Implementation of the Plan

### 1. Assumption of Allowed Claims

The Reorganized Debtors shall assume the liability for and obligation to perform and make all distributions or payments on account of all Allowed Claims in the manner provided in Articles III and IV of the Plan. All distributions or payments shall be made by the respective responsible Reorganized Debtors as set forth regarding the treatment of the respective Claims in Articles III and IV of the Plan.

### 2. Vesting of Assets

As of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets shall be transferred to, and vested in, the respective Reorganized Debtors, free and clear of all rights, title, interests, claims, liens, encumbrances and charges, except as expressly set forth in the Plan. Without limiting the generality of the foregoing, all Assets shall vest in the Reorganized Debtors free and clear of any Lien except as expressly provided in the Plan. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any claim without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

### 3. Performance of Plan

The payments to be made by Reorganized Majestic under the Plan shall be funded from Reorganized Majestic's income and revenues from operation of its business.

The payments to be made by Reorganized Majestic Grapevine under the Plan shall be funded from (a) available cash on hand held by Reorganized Grapevine and (b) payments received by Reorganized Majestic Grapevine from Reorganized Majestic under the Plan on account of Majestic Grapevine's Rejection Claim against Majestic arising from Majestic's rejection of the lease

between Majestic Grapevine and Majestic with respect to the Cuney Property.

The payments to be made by Reorganized Majestic Properties under the Plan shall be made from the Majestic Properties Savings Account.

The payments to be made by the Reorganized Individual Debtors under the Plan shall be funded from (a) the funds received by the Reorganized Individual Debtors on account of the Bratton/Fair Tax Refunds, (b) the Reorganized Individual Debtors' future earnings, and/or (c) other sources of available cash on hand of the Reorganized Individual Debtors.

### 4. Preservation of Interdebtor Claims

All Interdebtor Claims, as the same exist as of the Effective Date, shall be preserved and remain unaffected by the Plan; provided, however, that Interdebtor Claims shall be subordinate to all other Allowed Claims and no payment or distribution shall be made on account of any Interdebtor Claim until such time as all payments and distributions on account of other Allowed Claims required under the Plan have been made; provided further, however, that the Majestic Properties Avoidance Claim shall be compromised between Majestic and Majestic Properties pursuant to Article 6.5 of the Plan.

### 5. Use of Funds from Majestic Properties Savings Account for Development of Majestic

From and after the Effective Date, after all Allowed Administrative Claims are paid in full, Reorganized Majestic Properties shall, in addition to making any payments it is required to make under the Plan, utilize the funds held in the Majestic Properties Savings Account to support and further capitalize Reorganized Majestic's business operations, including the opening of new locations.

### 6. Corporate Action and Continued Corporate Existence of Debtors

The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors (as the case may be) to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, any action required by the stockholders or directors of the Debtors and the Reorganized Debtors (as the case may be), including, among other things, (a) the execution and delivery of the F&M Bank Exit Facility Documents; (b) the adoption or amendment of any organizational documents; (c) all transfers of Assets that are to occur pursuant to the Plan; (d) the incurrence of all obligations contemplated by the Plan and the making of all distributions required under the Plan; (e) the reinstatement and assumption of all indemnity obligations to the directors and officers of the Debtors; (f) taking of all actions to preserve and provide for the prosecution of retained causes of action, including but not limited to the Avoidance Actions; and (g) entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

The officers of the Debtors and the Reorganized Debtors, as the case may be, shall be authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of the Debtors. All obligations of the Debtors to indemnify and hold harmless their current and former directors, officers and

employees, whether arising under the Debtors' constituent documents, contract, law or equity, shall be fully reinstated and assumed by the Debtors upon the occurrence of the Effective Date with the same effect as though such obligations constituted executory contracts that are assumed (or assumed and assigned, as applicable) under section 365 of the Bankruptcy Code, and all such obligations shall be fully enforceable on their terms from and after the Effective Date.

Each of the Majestic Debtors shall continue to exist, as a Reorganized Debtor, after the Effective Date as a separate entity, with all the powers available to such legal entity, in accordance with applicable law and pursuant to their constituent documents. On or after the Effective Date, the Reorganized Debtors may, within their sole and exclusive discretion, take such action as permitted by applicable law and their constituent documents as they determine is reasonable and appropriate, including (a) causing any or all of the Reorganized Debtors to be merged into one or more of the other Reorganized Debtors or other legal entities; (b) liquidating any of the Reorganized Debtors; and (c) changing the legal name of any of the Reorganized Debtors.

### 7. Distributions by Reorganized Majestic to John Bratton and Kyle Fair for Income Tax Payments

From and after the Effective Date, John Bratton and Kyle Fair may receive distributions from Majestic for the purpose of satisfying any income taxes which John Bratton and Kyle Fair are required to pay based on Majestic's status as a pass-through entity for tax purposes. Any such distributions shall be made in an amount no greater than the amount necessary to fully pay any such individual tax liability of John Bratton and Kyle Fair. Other than such distributions and the regular salaries paid to John Bratton and Kyle Fair as compensation, Reorganized Majestic shall make no other or further distributions to John Bratton and/or Kyle Fair from and after the Effective Date until such time as all payments on account of Allowed Claims required under the Plan have been made.

### 8. Attorney's Fees and Costs of Secured Creditors

To the extent any holder of a Secured Claim asserts a right to attorneys fees and expenses pursuant to section 506(b) of the Bankruptcy Code, unless otherwise agreed between the Debtors or Reorganized Debtors and such Secured Creditor, the allowance of such fees and expenses shall be handled as set forth in Article 6.12 of the Plan. Within twenty-one (21) days after the Effective Date, the Secured Creditor shall file an application with the Bankruptcy Court for allowance of such fees and expenses. Such application will follow the same rules and guidelines as a fee application for a Professional seeking compensation from the Debtors, including the United States Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses. Within twenty-one (21) days after such application is filed, the Reorganized Debtors may file any objections thereto, and the Secured Creditor shall file any response within fourteen (14) days thereafter. If the Secured Creditor and the Reorganized Debtors are unable to reach agreement, the matter shall then be submitted to the Bankruptcy Court for determination on no less than twenty-one (21) days notice of the hearing. Notwithstanding the foregoing, attorney's fees and expenses of F&M Bank shall be paid in accordance with the terms of the F&M Bank Exit Facility.

## D. Provisions Governing Distributions

### 1. Date of Distributions

No payment or distribution shall be made pursuant to the Plan except on account of an Allowed Claim, except as otherwise ordered by the Bankruptcy Court pursuant to a Final Order. No payment shall be made on account of any Contested Claim until such Claim is Allowed. Any payments or distributions to be made pursuant to the Plan shall be made on the respective Initial

Distribution Dates applicable to each such Allowed Claim except as otherwise provided in the Plan or ordered by the Bankruptcy Court. In the event a distribution shall be payable on a day other than a Business Day, such distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been timely made on the date otherwise due. Any Unclaimed Property may be held and distributed in accordance with the Orders of the Court.

### 2. Distributions Under Plan

Distributions to be made to any Creditor under the Plan shall be made by the Reorganized Debtor which is responsible for making such distributions pursuant to the terms of the Plan.

### 3. Means of Cash Payment

Except as otherwise agreed by the Reorganized Debtors, any distribution to be made in cash under the Plan shall be made, at the election of the Reorganized Debtors, by check drawn on a domestic bank or by wire transfer from a domestic bank.

### 4. Delivery of Distributions

Distributions and deliveries to the holder of an Allowed Claim shall be made at the address set forth on the respective proofs of claim filed in the Chapter 11 Cases. If no proof of claim is filed, distribution shall be made to the Creditor at the address reflected in the Schedules. If any distribution is returned as undeliverable, no further distribution shall be made on account of such Allowed Claim unless and until the Reorganized Debtors are notified of such holder's then current address, at which time all missed distributions shall be made to the holder of such Allowed Claim. All claims for undeliverable distributions shall be made on or before the first anniversary of the attempted distribution. After such date, all Unclaimed Property shall revert to Estate Funds, and the Claim of any holder with respect to such property shall be discharged and forever barred.

### 5. Time Bar to Cash Payments

Checks issued on account of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Reorganized Debtors by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of the first anniversary of the Initial Distribution Date or ninety (90) days after the date of issuance of such check. After such date, all Claims in respect of void checks shall be discharged and forever barred.

### 6. Cure Period

Except as otherwise set forth in the Plan, the failure by a Reorganized Debtor to timely perform any term, provision or covenant contained in the Plan, or to make any payment required by the Plan to any Creditor, or the failure to make any payment or perform any covenant on any note, instrument or document issued pursuant to the Plan, shall not constitute an Event of Default unless and until the Reorganized Debtor has been given thirty (30) days written notice of such alleged default. Until the expiration of such thirty (30) day cure period, the Reorganized Debtor shall not be in default, and performance during such thirty (30) day period shall be deemed as timely for all purposes. Such written notice and passage of the thirty (30) day cure period shall constitute conditions precedent to declaring or claiming any default under the Plan or bringing any action or legal proceeding by any Person to enforce any right granted under the Plan.

## E.    Procedures for Resolving and Treating Contested and Contingent Claims

### 1.    Objection Deadline

The Court may, but is not required to, fix an Objection Deadline; provided, however, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of claim. If an Objection Deadline is fixed, it may be extended one or more times by order of the Bankruptcy Court pursuant to a motion filed on or before the then applicable Objection Deadline without notice or a hearing. Any proof of claim filed more than sixty (60) days after the Effective Date shall be of no force and effect and need not be objected to. Any Contested Claims may be litigated to Final Order. The Reorganized Debtors may compromise and settle any Contested Claim subject to approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 after appropriate notice and opportunity for hearing.

### 2.    Responsibility for Objecting to Claims

The Reorganized Debtors shall have the sole right and responsibility to (a) object to the allowance of Claims following the Effective Date, or (b) seek to subordinate any Claim.

### 3.    Distributions on Account of Contested Claims

Except as otherwise expressly provided in the Plan, if a Claim is Contested, then the Initial Distribution Date as to such Contested Claim shall be determined based upon its date of Allowance, and thereafter distribution shall be made on account of such Allowed Claim pursuant to the provisions of the Plan. No distribution shall be made on account of a Contested Claim until Allowed. Until such time as a Disputed Claim becomes fixed and absolute by a Final Order allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and distributions under the Plan. Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

### 4.    No Waiver of Right to Object

Except as expressly provided in the Plan, nothing contained in the Disclosure Statement, the Plan or the Confirmation Order shall waive, relinquish, release or impair the Reorganized Debtors' rights to object to any Claim.

### 5.    Rights Under Section 505

The Reorganized Debtors shall retain all rights pursuant to section 505 of the Bankruptcy Code as to any Tax Claim. Without limiting the generality of the foregoing, the appropriate Reorganized Debtors, including John Bratton, Kyle Fair and Suzanne Fair, shall have full authority to pursue the Bratton/Fair Tax Refunds pursuant to section 505 of the Bankruptcy Code.

### 6.    Allowance of Contested Claims

Nothing contained in the Plan, Disclosure Statement or Confirmation Order shall change, waive or alter any requirement under applicable law that the holder of a Contested Claim must file a timely proof of claim, and the Claim of any such holder of a Contested Claim who is required to file a proof of claim and fails to do so shall be discharged and the holder of such Contested Claim shall receive no distribution through the Plan. The adjudication and liquidation of Contested Claims is a determination and adjustment of the debtor/creditor relationship, and is therefore an exercise of the Bankruptcy Court's equitable power to which the legal right of trial by jury is inapplicable. The holder

of any Contested Claim shall not have a right to trial by jury before the Bankruptcy Court in respect of any such Claim. Exclusive venue for any Contested proceeding shall be in the Bankruptcy Court. Contested Claims shall each be determined separately, except as otherwise ordered by the Bankruptcy Court. Texas Rule of Civil Procedure 42 and Federal Rule of Civil Procedure 23 shall not apply to any Contested proceeding. The Reorganized Debtors shall retain all rights of removal to federal court as to any Contested proceeding.

All Contested Claims shall be liquidated and determined as follows:

Unless otherwise ordered by the Bankruptcy Court, any objection to a Contested Claim shall be treated as a contested proceeding subject to Rule 9014 of the Bankruptcy Rules. However, any party may move the Bankruptcy Court to apply the rules applicable to adversary proceedings to any Claim objection. The Reorganized Debtors, however, may, at their election, make and pursue any objection to a Claim in the form of an adversary proceeding.

Unless otherwise ordered by the Bankruptcy Court, or if the objection is pursued as an adversary proceeding, a scheduling order shall be entered as to each objection to a Claim. The scheduling order may include (a) discovery cut-off, (b) deadlines to amend pleadings, (c) deadlines for designation of and objections to experts, (d) deadlines to exchange exhibit and witness lists and for objections to the same, and (e) such other matters as may be appropriate.

The Bankruptcy Court may order the parties to mediate in connection with any objection to a Claim. The Reorganized Debtors may include a request for mediation in an objection, and request that the Bankruptcy Court require mediation as a part of the scheduling order.

### 7. Substantial Consummation

All distributions of any kind made to any of the Creditors or any Professionals after Substantial Consummation and any and all other actions taken under the Plan after Substantial Consummation shall not be subject to relief, reversal or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8005.

### 8. Offsets and Defenses

The Reorganized Debtors shall be vested with and retain all defenses or affirmative defenses against any Claim, including without limitation all rights of offset or recoupment and all counterclaims against any Claimant, *provided, however,* that no such defenses, affirmative defenses, rights of offset or recoupment, or counterclaims against F&M Bank shall be vested with and retained by the Reorganized Debtors. Assertion of any right of offset, recoupment or any counterclaim by the Reorganized Debtors against Claimants shall constitute a "core" proceeding.

### F. Executory Contracts and Unexpired Leases

### 1. Executory Contracts of Majestic Assumed

All executory contracts or unexpired leases of Majestic not previously rejected shall be deemed as assumed upon the Effective Date. The Plan shall constitute a motion to assume all executory contracts and unexpired leases unless otherwise expressly rejected by Majestic. However, Majestic may file a separate motion for the assumption or rejection of any executory contract or unexpired lease.

## 2. Executory Contracts of Debtors other than Majestic Rejected

All executory contracts or unexpired leases of any Debtor, other than Majestic, not previously assumed shall be deemed as rejected upon the Effective Date. The Plan shall constitute a motion to reject all executory contracts and unexpired leases of the Debtors, other than Majestic, unless otherwise expressly assumed. However, the Debtors may file a separate motion for the assumption or rejection of any executory contract or unexpired lease.

## 3. Bar to Rejection Damages

Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an executory contract or an unexpired lease shall be forever barred and shall not be enforceable against the Reorganized Debtors, the Estate Funds and the Assets, unless a proof of claim is filed with the Bankruptcy Court and served upon the Reorganized Debtors no later than thirty (30) days after the Confirmation Date. The foregoing deadline for filing Rejection Claims applies only to Rejection Claims arising out of executory contracts and unexpired leases that are rejected pursuant to the Plan. Nothing in the Plan shall alter the deadline for filing a Rejection Claim for a party to an executory contract or unexpired lease that was rejected by separate motion or by operation of law.

## 4. Rejection Claims

Any Rejection Claim which is allowed and is not barred by Article 9.3 of the Plan shall be subject to the provisions of section 502(g) of the Bankruptcy Code, classified as an Unsecured (General) Claim, and shall be included in the Class of Unsecured (General) Claims against the specific Debtor that rejected the executory contract or unexpired lease giving rise to such Rejection Claim; provided, however, that any Rejection Claim based upon the rejection of an unexpired lease of real property, either prior to the Confirmation Date or upon the entry of the Confirmation Order, shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements. Nothing contained in the Plan or Disclosure Statement shall be deemed an admission by the Debtors or Reorganized Debtors that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtors or Reorganized Debtors of any objections to such Claim if asserted.

## 5. Cure Payments

All cure payments which may be required by section 365(b)(1) of the Bankruptcy Code under any executory contract or unexpired lease that is assumed, or assumed and assigned, under the Plan shall be made by the Reorganized Debtor assuming, or assuming and assigning, such executory contract or unexpired lease on the Initial Distribution Date unless other treatment is provided for such claim under the Plan; provided, however, in the event of a dispute regarding the amount of any cure claim, the cure of any other defaults, the ability of the Reorganized Debtor to provide adequate assurance of future performance, or any other matter pertaining to assumption or assignment, the Reorganized Debtor shall make such cure payment and cure such other defaults and provide adequate assurance of future performance, all as may be required by section 365(b)(1) of the Bankruptcy Code, following the entry of a Final Order by the Bankruptcy Court resolving such dispute.

### G. Maintenance of Causes of Action

#### 1. Generally

Except as expressly set forth in the Plan, all Causes of Action (including all Avoidance Actions), claims, counterclaims, defenses and rights of offset or recoupment belonging to any of the Debtors shall, upon the occurrence of the Effective Date, be retained by, received by and vested in the Reorganized Debtors for the benefit of the Debtors and the Debtors' estates. Except as expressly set forth in the Plan, the rights of the Reorganized Debtors to commence, prosecute or settle such Causes of Action, respectively, shall be preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors will not pursue any and all available Causes of Action (including all Avoidance Actions) against them. The Debtors and their estates expressly reserve all rights to prosecute any and all Causes of Action (including all Avoidance Actions) against any Person, except as otherwise provided in the Plan.** Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtors expressly reserve all Causes of Action (including all Avoidance Actions) for later adjudication, and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

#### 2. Causes of Action Against Claimants

Except as expressly set forth in the Plan, the Reorganized Debtors shall retain all Causes of Action (including all Avoidance Actions), claims, counterclaims, defenses and rights of offset or recoupment as against all Claimants. Nothing in the Plan shall waive or impair any Cause of Action (including all Avoidance Actions), claims, counterclaims, defenses and rights of offset or recoupment. Any Cause of Action (including any Avoidance Action) claim, or counterclaim brought by the Reorganized Debtors against Creditors filing Claims in the Chapter 11 Cases shall constitute a "core" proceeding.

#### 3. Release of Claims and Causes of Action Against F&M Bank and Centennial

In connection with the F&M Bank Exit Facility, the Debtors will release any and all claims and causes of action they may possess against F&M Bank as of the Effective Date. Majestic will also grant to Centennial a release of any and all claims and causes of action that Majestic may possess against Centennial as of the Effective Date.

### H. Conditions Precedent to Confirmation and Effectiveness of Plan

#### 1. Conditions to Confirmation and Effectiveness of Plan

The Plan shall not become effective until the following conditions shall have been satisfied or waived by the Debtors, as appropriate, as determined in the Debtors' sole discretion: (a) the Confirmation Order shall have been entered, in form and substance acceptable to the Debtors; (b) all other conditions precedent have been satisfied to the satisfaction of the Debtors; (c) the Bar Date has passed, and no additional claims have been filed which, in the sole discretion of the Debtors and their management, adversely impact the Plan; and (d) a notice of the Effective Date has been filed by the Debtors and thereafter served upon all Creditors and parties in interest. Any of the

above conditions may be waived by the Debtors.

### 2. Revocation of Plan

The Debtors may revoke and withdraw the Plan at any time before the Effective Date. If the Debtors revoke or withdraw the Plan, or if confirmation of the Plan does not occur, then, the Plan shall be deemed null and void and nothing contained in the Plan shall be deemed to constitute (a) a waiver or release of any Claims or Causes of Action by or against the Debtors, as the case may be, or any other Person, or to prejudice in any manner the rights of such Debtors, or Person, in any further proceedings involving such Debtors, or (b) an admission, acknowledgment, offer or undertaking by the Debtors or any other party in interest.

## I. Discharge

### 1. Discharge of Certain Majestic Debtors

The terms, covenants and consideration under the Plan shall be in exchange for, and in complete satisfaction, discharge, and release of, all Claims of any nature whatsoever against Majestic, Majestic Properties, Majestic GP, Reorganized Majestic, Reorganized Majestic Properties, Reorganized Majestic GP and/or the Assets of Majestic, Majestic Properties and Majestic GP, including, without limitation, all Secured Claims and all Unsecured (General) Claims. Except as otherwise expressly provided in the Plan, upon the Effective Date, Reorganized Majestic, Reorganized Majestic Properties and Reorganized Majestic GP, and their successors in interest and assigns, shall be deemed discharged and released pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code; (c) the holder of a Claim based upon such debt has accepted the Plan; or (d) the Claim has been Allowed, Disallowed, or estimated pursuant to section 502(c) of the Bankruptcy Code. The Confirmation Order shall be a judicial determination of discharge of all liabilities of Reorganized Majestic, Reorganized Majestic Properties and Reorganized Majestic GP, and their successors in interest and assigns, other than those obligations specifically set forth pursuant to the Plan. Because Majestic Grapevine and Majestic GP II will not engage in business after consummation of the Plan, Majestic Grapevine and Majestic GP II will not receive a discharge.

### 2. Discharge of Individual Debtors

The terms, covenants and consideration under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Individual Debtors, Reorganized Individual Debtors or the Assets of the Individual Debtors, including, without limitation, all Secured Claims, Other Secured Claims and Unsecured (General) Claims. Both the Reorganized Individual Debtors and their successors in interest and assigns shall be deemed discharged and released pursuant to section 1141(d)(5) of the Bankruptcy Code from any and all Claims provided for in the Plan upon completion of all payments required to be made by the Reorganized Individual Debtors under the Plan and the granting of a discharge by the Bankruptcy Court in favor of the Reorganized Individual Debtors; provided, however, nothing contained in the Plan shall be deemed a waiver of any Reorganized Individual Debtor's right to petition the Bankruptcy Court for a discharge following confirmation of the Plan, but prior to completion of all payments required to be made by such Reorganized Individual

Debtor under the Plan, pursuant to section 1141(d)(5) of the Bankruptcy Code.

## 3. Injunction

On the Effective Date and except as otherwise provided in the Plan, all Persons who have been, are, or may be holders of Claims against or Interests in the Debtors shall be permanently restrained and enjoined from taking any of the following actions against or affecting the Debtors, the Debtors' estates, the Assets, or their respective assets and property, with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under the Plan): (a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind with respect to any such Claim or Interest; (b) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind; (d) asserting any control over, interest, rights or title in or to any of the Assets except as expressly provided in the Plan; (e) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Reorganized Debtors as assignees, except upon order of the Bankruptcy Court; and (f) performing any act, by any manner or means, whether directly or indirectly, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; provided, however, that the injunction shall not bar any Creditor from asserting any right granted pursuant to the Plan.

## 4. Automatic Stay

The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtors and all Assets. Upon the Effective Date, the automatic stay shall be replaced by the injunction set forth in Article 12.3 of the Plan.

## J. Consummation Of The Plan

### 1. Retention of Jurisdiction

Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, for the purposes of sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a) To hear and determine any and all objections to or applications concerning the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense Claim or Claim;

(b) To hear and determine any and all applications for payments of fees and expenses from the Reorganized Debtors' estates made by attorneys or any other Professional pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed from the Reorganized Debtors' estates under the Bankruptcy Code, and any and all objections thereto;

(c) To hear and determine pending applications for the rejection, assumption, or assumption and assignment of unexpired leases and executory contracts and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect to the assumption or rejection of any executory contract or unexpired lease;

(d) To hear and determine any and all adversary proceedings, applications, or contested matters, including any remands or appeals;

(e) To hear and determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan, including without limitation, (i) adjudication of all rights, interests or disputes relating to any of the Assets, (ii) the valuation of all Collateral, including hearing all valuation motions, (iii) the determination of the validity of any Lien or claimed right of offset; and (iv) determinations of objections to Contested Claims;

(f) To liquidate any disputed, contingent, or unliquidated Claims;

(g) To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(h) To determine all issues relating to the enforcement, fixing or liquidation of Claims;

(i) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(j) To enable the Reorganized Debtors to prosecute any and all proceedings which may be brought to set aside liens or encumbrances and to recover any transfers, assets, properties or damages to which the Reorganized Debtors may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws, including causes of action, controversies, disputes and conflicts between the Reorganized Debtors and any other party, including but not limited to, any Causes of Action, Avoidance Actions, objections to Claims, preferences, fraudulent transfers and obligations or equitable subordination;

(k) To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(l) To enforce the Plan injunction contained in Article 12.3 of the Plan;

(m) To provide for and approve the sale after the Effective Date of any of the Assets free and clear of all Liens, claims and interests;

(n) To enter and implement all such orders as may be necessary or appropriate to execute, interpret, implement, consummate, or enforce the terms and conditions of the Plan and the transactions contemplated thereunder;

(o) To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan;

(p) To determine proceedings pursuant to section 505 of the Bankruptcy Code;

(q) To enter a final decree closing the Chapter 11 Cases; and

(r)     To determine the amount of the Bratton/Fair Tax Refunds in accordance with section 505 of the Bankruptcy Code.

### 2.     Abstention and Other Courts

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Chapter 11 Cases, the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### 3.     Non-Material Modifications

The Reorganized Debtors may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable. The Reorganized Debtors may undertake such nonmaterial modification insofar as it does not adversely change the treatment of the Claim of any Creditor or the Interest of any Interest holder who has not accepted in writing the modification.

### 4.     Material Modifications

Modifications of the Plan may be proposed in writing by the Debtors at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Plan may be modified at any time after confirmation and before its Substantial Consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification. A holder of a Claim or Interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

## K.     Miscellaneous Provisions

### 1.     Severability

Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Reorganized Debtors may modify the Plan in accordance with Article XIII of the Plan so that such provision shall not be applicable to the holder of any Claim or Interest. Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the resolicitation of any acceptance or rejection of the Plan.

### 2.     Oral Agreements; Modification of Plan; Oral Representations or Inducements

The terms of the Plan, Disclosure Statement and Confirmation Order may not be changed, contradicted or varied by any oral statement, agreement, warranty or representation. The Plan may only be modified, amended or supplemented in writing signed by the Debtors or the Reorganized Debtors, as the case may be.  Neither the Debtors nor their attorneys have made any representation, warranty, promise or inducement relating to the Plan or its confirmation except as expressly set forth in the Plan or this Disclosure Statement.

### 3. Waiver

The Reorganized Debtors shall not be deemed to have waived any right, power or privilege pursuant to the Plan unless the waiver is in writing and signed by the Reorganized Debtors. There shall be no waiver by implication, course of conduct or dealing, or through any delay or inaction by the Reorganized Debtors, of any right pursuant to the Plan, including the provisions of the anti-waiver section under Article 14.3 of the Plan. The waiver of any right under the Plan shall not act as a waiver of any other or subsequent right, power or privilege.

### 4. Construction

The Plan shall control over any inconsistent term of the Disclosure Statement. The Confirmation Order shall control over any inconsistent provision of both the Plan and Disclosure Statement.

### 5. Notice

Any notice or communication required or permitted by the Plan shall be in writing given, made or sent as follows:

     (a)    If to a Creditor, notice may be given as follows: (i) if the Creditor has filed no proof of claim, then to the address reflected in the Schedules, or (ii) if the Creditor has filed a proof of claim, then to address reflected in the proof of claim.

     (b)    If to Reorganized Debtors, notice shall be sent to the following addresses:

          (i)    Majestic Liquor Stores, Inc.
Attn: Ben Lanford, President
1111 Jacksboro Hwy.
Fort Worth, TX 76107
Email: blanford@majesticliquors.com

          (ii)    Majestic Texas Properties, L.P.
Attn: John M. Bratton
2125 Sutton Place
Plano, TX 75093
Email: johnbratton@verizon.net

          (iii)    Majestic Texas-Grapevine, L.P.
Attn: John M. Bratton
2125 Sutton Place
Plano, TX 75093
Email: johnbratton@verizon.net

          (iv)    Majestic GP, LLC
Attn: John M. Bratton
2125 Sutton Place
Plano, TX 75093
Email: johnbratton@verizon.net

(v)     Majestic GP II, LLC
Attn: John M. Bratton
2125 Sutton Place
Plano, TX 75093
Email: johnbratton@verizon.net

(vi)     John M. Bratton
2125 Sutton Place
Plano, TX 75093
Email: johnbratton@verizon.net

(vii)     Kyle T. Fair
Suzanne P. Fair
5609 Cradlerock Circle
Plano, TX 75093
Email: kylefair@gmail.com

Concurrently with service of such notice on Reorganized Debtors, a copy thereof shall be concurrently served in the same manner on the following legal counsel as follows:

(i)     J. Robert Forshey
Jeff P. Prostok
Forshey & Prostok, L.L.P.
777 Main Street, Suite 1290
Fort Worth, Texas 76102
(817) 877-4151 fax
Email: bforshey@forsheyprostok.com
Email: jprostok@forsheyprostok.com

(ii)     Joseph F. Postnikoff
Goodrich Postnikoff & Albertson, LLP
777 Main Street, Suite 1360
Fort Worth, TX 76102
(817) 335-9411 fax
Email: jpostnikoff@gpalaw.com

(iii)     John Y. Bonds, III
Shannon, Gracey, Ratliff & Miller, LLP
777 Main Street, Suite 3800
Fort Worth, TX 76102
(817) 336-3735 fax
Email: jbonds@shannongracey.com

(iv)     Joe E. Marshall
Deborah M. Perry
Munsch Hardt Kopf & Harr, PC
500 North Akard, Suite 3800
Dallas, TX 75201-6659
(214) 855-7584 fax
Email: jmarshal@munsch.com
Email: dperry@munsch.com

(v)    United States Trustee
       Attn: Elizabeth Ziegler, Trial Attorney
       1100 Commerce Street, Room 976
       Dallas, TX 75242
       Email: elizabeth.ziegler@usdoj.gov

Any Creditor desiring to change its address for the purpose of notice may do so by giving notice to the Reorganized Debtors of its new address in accordance with the terms of Article 14.5(b) of the Plan.

Any notice given, made or sent as set forth in Article 14.5 of the Plan shall be in writing and effective upon being (i) deposited in the United States Mail, postage prepaid, addressed to the addressee at the address required under Article 14.5 of the Plan; (ii) delivered by hand or messenger to the addressee at the address required under Article 14.5 of the Plan; (iii) telecopied to the addressee as set forth under Article 14.5 of the Plan, with a hard confirmation copy being immediately sent through the United States Mail; or (iv) delivered for transmission to an expedited or overnight delivery service such as FedEx.

**6.    Setoffs**

The Reorganized Debtors may, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by the Reorganized Debtors of any such claim that they may have against such holder.

**7.    Compliance with All Applicable Laws**

If notified by any governmental authority that they are in violation of any applicable law, rule, regulation, or order of such governmental authority relating to their businesses, the Reorganized Debtors shall comply with such law, rule, regulation, or order; provided that nothing contained in the Plan shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, an adequate reserve has been set aside on the books of the Reorganized Debtors.

**8.    Exculpations**

No member of the Committee or any Professional retained by the Committee shall ever have any liability to any Person (including any Creditor) other than the Debtors or Reorganized Debtors for any act, omission, or event in connection with, or arising out of, or relating to, any of the following: (a) the Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Debtors' estates, (b) the Plan, including the proposal, negotiation, confirmation, or consummation of the Plan, or (c) the administration of the Plan on a post-confirmation basis.

**9.    Binding Effect**

The Plan shall be binding upon, and shall inure to the benefit of the Reorganized Debtors, the holders of Claims or Liens, the holders of Interests, and their respective successors in interest and assigns.

### 10.    Governing Law, Interpretation

Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any plan documents without regard to conflicts of law. The Plan shall control any inconsistent term or provision of any other plan documents.

### 11.    Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on or before the Effective Date, and thereafter as such statutory fees become due.

### 12.    Filing of Additional Documents

On or before Substantial Consummation of the Plan, the Reorganized Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 13.    Computation of Time

If the final day for any distribution, performance, act or event under the Plan is not a Business Day, then the time for making or performing such distribution, performance, act or event shall be extended to the next Business Day.

### 14.    Elections by the Reorganized Debtors

Any right of election or choice granted to the Reorganized Debtors under the Plan may be exercised, at the Reorganized Debtors' election, separately as to each Claim, Creditor or Person.

### 15.    Release of Liens

Except as otherwise provided in the Plan or the Confirmation Order, all Liens against any of the Assets shall be deemed to be released, terminated and nullified.

### 16.    Retiree Benefits

Pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 17.    Rates

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

### 18.    Notice of Entry of Confirmation Order

Promptly upon entry of the Confirmation Order, the Debtors, as directed by the Bankruptcy Court, shall serve on all known parties in interest and holders of Claims and Interests, notice of entry of the Confirmation Order.

### 19. Interest and Attorneys Fees

Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law. Except as set forth in the Plan or as ordered by the Bankruptcy Court, no award or reimbursement of attorneys fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim.

### 20. Compliance with Tax Requirements

In connection with the Plan, the Debtors shall comply with all withholding and reporting requirements imposed by federal, state and local Taxing Authorities and all distributions under the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution under the Plan.

### 21. No Admissions

As to contested matters, adversary proceedings and other causes of action or threatened causes of action, the Plan shall not constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations. The Plan shall not be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan as to holders of Claims against, and Interests in, the Debtors or their affiliates, as debtors and debtors in possession in the Chapter 11 Cases.

## VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE PLAN AND ITS RELATED TAX CONSEQUENCES ARE COMPLEX. MOREOVER, MANY OF THE INTERNAL REVENUE CODE PROVISIONS DEALING WITH THE FEDERAL INCOME TAX ISSUES ARISING FROM THE PLAN HAVE BEEN THE SUBJECT OF RECENT LEGISLATION AND, AS A RESULT, MAY BE SUBJECT TO AS YET UNKNOWN ADMINISTRATIVE OR JUDICIAL INTERPRETATIONS. THE DEBTOR HAS NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE (THE "IRS") OR AN OPINION OF COUNSEL WITH RESPECT TO THESE MATTERS. ACCORDINGLY, NO ASSURANCE CAN BE GIVEN AS TO THE INTERPRETATION THAT THE IRS WILL ADOPT. THERE ALSO MAY BE STATE, LOCAL OR OTHER TAX CONSIDERATIONS APPLICABLE TO EACH CREDITOR. CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND OTHER TAX LAWS.

## IX. CONFIRMATION OF THE PLAN

### A. Solicitation of Votes; Voting Procedures

#### 1. Ballots and Voting Deadlines

A ballot to be used for voting to accept or reject the Plan, together with a postage-paid return envelope, is enclosed with all copies of this Disclosure Statement mailed to all holders of Claims and Interests entitled to vote. BEFORE COMPLETING YOUR BALLOT, PLEASE READ CAREFULLY THE INSTRUCTION SHEET THAT ACCOMPANIES THE BALLOT.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than 5:00 p.m., Central Time, on ▨▨▨▨▨▨, 2010 at the following address:

Forshey & Prostok, L.L.P.
777 Main Street, Suite 1290
Fort Worth, Texas 76102
Attn: Linda Breedlove

YOUR BALLOT MAY NOT BE COUNTED IF IT IS RECEIVED AT THE ABOVE ADDRESS AFTER 5:00 P.M., CENTRAL TIME, ON ▨▨▨▨▨▨, 2010.

2.      **Parties in Interest Entitled to Vote**

The holder of a Claim or Interest may vote to accept or reject the Plan only if the Plan impairs the Class in which such Claim or Interest is classified. Under the Plan, Classes 1, 2, 3, 4, 5, 6, 7 and 10 are impaired. Therefore, all holders of Claims in these Classes may vote to accept or reject the Plan.

Any Claim or Interest as to which an objection has been filed is not entitled to vote unless the Bankruptcy Court, upon application of the holder to whose Claim or Interest an objection has been made, temporarily allows such Claim or Interest in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Any such application must be heard and determined by the Bankruptcy Court on or before commencement of the Confirmation Hearing. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE APPLICABLE COUNSEL AT THE FOLLOWING ADDRESSES:

**Creditors of Majestic, Majestic Grapevine and/or Majestic GP II should contact:**

J. Robert Forshey
Jeff P. Prostok
Forshey & Prostok, L.L.P.
777 Main Street, Suite 1290
Fort Worth, Texas 76102
(817) 877-8855
(817) 877-4151 fax
Email: bforshey@forsheyprostok.com
Email: jprostok@forsheyprostok.com

**Creditors of Majestic Properties and/or Majestic GP should contact:**

Joseph F. Postnikoff
Goodrich Postnikoff & Albertson, LLP
777 Main Street, Suite 1360
Fort Worth, TX 76102
(817) 335-9400
(817) 335-9411 fax
Email: jpostnikoff@gpalaw.com

**Creditors of John Bratton, Kyle Fair, and/or
Suzanne Fair should contact:**

John Y. Bonds, III
Shannon, Gracey, Ratliff & Miller, LLP
777 Main Street, Suite 3800
Fort Worth, TX 76102
(817) 336-9333
(817) 336-3735 fax
Email: jbonds@shannongracey.com

### 3. Vote Required for Class Acceptance

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots for acceptance or rejection of the Plan. Thus, class acceptance takes place only if at least two-thirds in amount and a majority in number of the holders of claims voting cast their ballots in favor of acceptance.

The Bankruptcy Code defines acceptance of a plan by a class of Interests as acceptance by holders of at least two-thirds in amount of the Interests of that class that actually cast ballots for acceptance or rejection of the plan. Thus, class acceptance takes place only if at least two-thirds in amount of the holders of Interests voting cast their ballots in favor of acceptance.

## B. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. By order of the Bankruptcy Court, the Confirmation Hearing has been scheduled for December 21, 2010, at 9:30 a.m. Central Time, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court on or before 4:30 p.m., Central Time, ⬛⬛⬛⬛⬛⬛, 2010, at the following address:

> Office of the Clerk
> U.S. Bankruptcy Court
> Eldon B. Mahon U.S. Courthouse
> 501 W. Tenth Street
> Fort Worth, Texas 76102-3643

In addition, any such objection must be served upon the following parties, together with proof of service, on or before 4:30 p.m., Central Time, ⬛⬛⬛⬛⬛⬛, 2010:

J. Robert Forshey
Jeff P. Prostok
Forshey & Prostok, L.L.P.
777 Main Street, Suite 1290
Fort Worth, Texas 76102
(817) 877-4151 fax
Email: bforshey@forsheyprostok.com
Email: jprostok@forsheyprostok.com

Joseph F. Postnikoff
Goodrich Postnikoff & Albertson, LLP
777 Main Street, Suite 1360
Fort Worth, TX 76102
(817) 335-9411 fax
Email: jpostnikoff@gpalaw.com

John Y. Bonds, III
Shannon, Gracey, Ratliff & Miller, LLP
777 Main Street, Suite 3800
Fort Worth, TX 76102
(817) 336-9333 fax
Email: jbonds@shannongracey.com

United States Trustee
Attn: Elizabeth Ziegler, Trial Attorney
1100 Commerce Street, Room 976
Dallas, TX 75242
Email: elizabeth.ziegler@usdoj.gov

Joe E. Marshall
Deborah M. Perry
Munsch Hardt Kopf & Harr, PC
500 North Akard, Suite 3800
Dallas, TX 75201-6659
(214) 855-7584 fax
Email: jmarshal@munsch.com
Email: dperry@munsch.com

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## C.  Requirements for Confirmation of the Plan

At the confirmation hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. As set forth in section 1129 of the Bankruptcy Code, these requirements are as follows:

1. The plan complies with the applicable provisions of the Bankruptcy Code.

2. The proponents of the plan complied with the applicable provisions of the Bankruptcy Code.

3. The plan has been proposed in good faith and not by any means forbidden by law.

4. Any payment made or promised by the debtor, by the plan proponent, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of the Bankruptcy Court as reasonable.

5. (a) (i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(b) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

6. Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

7. With respect to each impaired class of claims or interests:

(a) each holder of a claim or interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code on such date; or

(b) if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

8. With respect to each class of claims or interests:

(a) such class has accepted the plan; or

(b) such class is not impaired under the plan.

9. Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(a) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b) with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive:

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(c)     with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim regular installment payments in cash:

(i)     of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii)     over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii)     in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); and

(d)     with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in 9(c) above.

10.     If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class.

11.     Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

12.     All fees payable under 28 U.S.C. section 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payments of all such fees on the effective date of the plan.

13.     The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

14.     If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

15.     In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan:

(a)     the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(b)     the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2) of the Bankruptcy Code) to be received during the five year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments,

whichever is longer.

16.     All transfers of property of the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

The Debtors believe that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all the requirements of chapter 11, and that the Plan is proposed in good faith.

The Debtors believe that holders of all Allowed Claims and Interests impaired under the Plan will receive payments under the Plan having a present value, as of the Effective Date, not less than the amounts likely to be received if the Debtors were liquidated in a case under chapter 7 of the Bankruptcy Code. At the Confirmation Hearing, the Bankruptcy Court will determine whether holders of Allowed Claims or Allowed Interests would receive greater distributions under the Plan than they would receive in a liquidation under chapter 7.

These facts and others demonstrating the confirmability of the Plan will be shown at the Confirmation Hearing.

## D.    Cramdown

In the event that any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to that Class. A plan of reorganization "does not discriminate unfairly" within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its claims or Interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims. As set forth in section 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1.     With respect to a class of secured claims, the plan provides:

(a)    (i)    that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii)    that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)    for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)    the realization by such holders of the "indubitable equivalent" of such claims.

2.      With respect to a class of unsecured claims, the plan provides:

    (a)      that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

    (b)      the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115 of the Bankruptcy Code, subject to the requirements of section 1129(a)(14) of the Bankruptcy Code.

3.      With respect to a class of interests, the plan provides:

    (a)      that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest; or

    (b)      that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

In the event that one or more Classes of impaired Claims or Interests reject the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired Class of Claims or Interests. For the reasons set forth above, the Debtors believe the Plan does not discriminate unfairly against, and is fair and equitable with respect to, each impaired Class of Claims or Interests.

## X. RISK FACTORS

The following is intended as a summary of certain risks associated with the Plan, but it is not exhaustive and must be supplemented by the analysis and evaluation made by each holder of a Claim or Interest of the Plan and this Disclosure Statement as a whole with such holder's own advisors.

## A.      Variances from Projections

While the Debtors are very confident regarding the projections in support of the Plan, there are various risk factors that must be considered.

## 1.      General

The Plan is premised on the financial analyses and projections prepared by Majestic in cooperation with Focus Management Group USA, Inc. and attached to the Disclosure Statement as **Exhibit "B"**. The projections contained in the financial analysis include, among other items, assumptions concerning general economic conditions, the ability to make necessary capital expenditures, and other factors. The Debtors believe that the assumptions underlying the projected financial statements are reasonable and that the Debtors will be able to perform their obligations under the Plan. There are certain other factors, however, that relate to the Reorganized Debtors' ability to achieve the projections.

With respect to holders of Allowed Class 2 Claims, payment in full of all Allowed Class 2

Claims is contingent on, *inter alia*, the following: (i) Reorganized Majestic's financial performance being strong enough to fund all distributions required to be made to holders of Allowed Class 2 Claims over the period of five (5) years during which such distributions must be made pursuant to Article 4.2 of the Plan; (ii) Majestic's ability to fully pay the New F&M Bank Note (which shall mature three (3) years after the Effective Date of the Plan) on or prior to the maturity date of the same; (iii) Majestic's ability to obtain replacement financing for the F&M Bank Exit Facility on or prior to the maturity date of the New F&M Bank Note; and (iv) Majestic's ability to make the final distribution on account of all Allowed Class 2 Claims (which final distribution shall be in the approximate amount of $3 million) when due in August, 2016.

## 2. Expenses

Majestic's management has projected increases in various expense categories. Majestic's assumptions about the increases in expenses have been broken out in its projections and are attached. Majestic's management believes that these projected increases in expense categories are reasonable based on history and the knowledge of Majestic's management. If expenses increase significantly beyond Majestic's projections, it could have an adverse impact on Majestic's business operations.

## 3. Economic Recession

Majestic's income projections are based on experience and take into account normal fluctuations in the economy generally. Nonetheless, a continued severe recession or economic depression could adversely affect Majestic's projections. Although Majestic believes the projections are conservative, Majestic cannot guarantee them. In the event that a severe economic downturn continues or occurs, Majestic could face difficulties in meeting the projections.

## 4. Local Option Elections

In the future, it is possible that voters, through local option elections, may vote to allow or expand the sale of alcoholic beverages for off-premises consumption in areas where such sales are currently prohibited or limited. In some instances, retail stores operated by Majestic serve some customers who reside in such areas that are currently "dry." To the extent that such areas may later become "wet" as a result of local option elections, the profitability of some of Majestic's retail stores may be adversely affected.

## B. Bankruptcy Risks

### 1. Insufficient Acceptances

For the Plan to be confirmed, each impaired Class of Claims is given the opportunity to vote to accept or reject the Plan. With regard to such impaired voting Classes, the Plan will be deemed accepted by a Class of impaired Claims if the Plan is accepted by claimants of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Claims of the Class voted. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes. The Debtors reserve the right to request confirmation pursuant to the cramdown provisions in section 1129(b) of the Bankruptcy Code, which will allow confirmation of the Plan regardless of the fact that a particular Class of Claims or Interests has not accepted the Plan. However, there can be no assurance that any impaired Class of Claims under the Plan will accept the Plan or that the Debtors would be able to use the cramdown provisions of the Bankruptcy Code for confirmation of the Plan.

2.      **Confirmation Risks**

The following specific risks exist with respect to confirmation of the Plan:

(a)      Any objection to confirmation of the Plan can either prevent confirmation of the Plan, or delay such confirmation for a significant period of time.

(b)      Since the Debtors may be seeking to obtain approval of the Plan over the rejection of one or more impaired Classes of Claims, the cramdown process could delay confirmation.

3.      **Conditions Precedent**

Confirmation of the Plan and occurrence of the Effective Date are subject to certain conditions precedent that may not occur. The Debtors, however, are working diligently with all parties in interest to ensure that all conditions precedent are satisfied.

## XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated several reorganization alternatives to the Plan, including the continued operation of the Debtors under their current debt structures and the liquidation of the Debtors. After studying these alternatives, the Debtors concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, assuming confirmation of the Plan and consummation of the transactions contemplated by the Plan. The following discussion provides a summary of the Debtors' analysis leading to its conclusion that the Plan will provide the highest value to holders of Claims.

A.      **Continued Operation Under Prepetition Debt Structure**

Due to the adversarial stance between the Debtors and F&M Bank at the outset of these cases, it was determined that alternatives to the continued operation by Majestic of its business under its prepetition debt structure would be explored. Majestic actively sought debtor in possession financing as an alternative to continued operation under its prepetition debt structure, and engaged in extensive negotiations with Wells Fargo Business Credit, but ultimately could not reach an agreement on terms for debtor in possession financing.

More recently, Majestic and F&M Bank entered into negotiations for exit financing, which negotiations resulted in an agreement between Majestic and F&M Bank for F&M Bank to provide exit financing in the form of the F&M Bank Exit Facility. The Debtors believe the terms of the F&M Bank Exit Facility are fair and reasonable, in the best interests of the Debtors, their estates and creditors, and will facilitate a successful reorganization of the Debtors. Therefore, the Debtors have concluded that replacing Majestic's prepetition debt structure with the debt structure contemplated by the F&M Bank Exit Facility is preferable to continued operation by Majestic under its prepetition debt structure.

B.      **The Liquidation of the Debtors**

The Debtors also have analyzed whether a chapter 7 liquidation of the Assets of the Debtors would be in the best interest of holders of Claims. That analysis reflects a liquidation value that is materially lower than the value that may be realized through the Plan. The Debtors believe that liquidation would result in substantial diminution in the value to be realized by holders of Claims because of (a) the failure to realize the greater going-concern value of the Debtors' Assets, and in

particular, Majestic's Assets; (b) additional administrative expenses involved in the appointment of a trustee or trustees, attorneys, accountants, and other professionals to assist such trustee(s) in the case of a chapter 7 proceeding; (c) additional expenses and claims, some of which would be entitled to priority in payments, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Majestic Debtors' operations; and (d) the substantial time which would elapse before creditors would receive any distribution in respect of their Claims. In the event of a liquidation, the Debtors estimate that holders of Unsecured (General) Claims would receive little, if any, distribution on account of their Claims.

With respect to Majestic, the amount of Unsecured (General) Claims against Majestic in a chapter 7 liquidation would be vastly greater than the amount of such claims under the Plan because, in a chapter 7 liquidation, all of Majestic's remaining leases for its stores would be rejected, possibly giving rise to significant Rejection Claims, whereas the Plan contemplates that all, or the majority, of Majestic's remaining leases will be assumed. The most valuable Asset of Majestic that would be liquidated in a chapter 7 proceeding is Majestic's inventory. Majestic believes that liquidation of its inventory would result in a recovery less than the value of the Inventory as reflected in Majestic's Schedules. A liquidation of Majestic's Assets, in a best case scenario, would probably generate proceeds sufficient to fully satisfy the secured F&M Bank Claim. However, even in such a best case scenario, any proceeds left available for distribution to unsecured creditors would be minimal and provide no more than a nominal recovery for unsecured creditors. The Plan, on the other hand, provides for full payment of all Unsecured (General) Claims against Majestic.[6] Majestic also notes that, in a liquidation scenario, the jobs of 342 employees, as well as over $8 million per year in payroll, would be lost.

With respect to Majestic Properties and Majestic Grapevine, each such Debtor possesses a Rejection Claim against Majestic. Under the Plan, the payments to be received by Majestic Properties and Majestic Grapevine from Majestic on account of such Rejection Claims will provide funds needed by Majestic Properties and Majestic Grapevine to fulfill their obligations under the Plan. If Majestic were to be liquidated in a chapter 7 proceeding, it is unlikely that Majestic Properties or Majestic Grapevine would obtain a meaningful recovery, if any at all, on their Rejection Claims against Majestic. Accordingly, the Debtors believe that a liquidation of Majestic Properties and Majestic Grapevine, with Majestic being liquidated as well, would result in little if any return to Creditors of Majestic Properties and Majestic Grapevine and, in any event, provide less of a return to such Creditors than that which such Creditors stand to receive under the Plan.

With respect to the Individual Debtors, one of their most valuable Assets – their Interests in Majestic – would have no value under a liquidation scenario. Liquidation of Majestic would also eliminate the compensation to be received by the Individual Debtors from Majestic, which compensation will provide one of the means by which the Individual Debtors will satisfy Allowed Claims against them under the Plan. Accordingly, liquidation of the Debtors would, in the case of the Individual Debtors, leave little non-exempt property which a trustee could liquidate to satisfy Claims against the Individual Debtors. The Individual Debtors believe that in a liquidation, little, if

---

6 Payment in full of all Allowed Class 2 Claims is contingent on, *inter alia*, the following: (i) Reorganized Majestic's financial performance being strong enough to fund all distributions required to be made to holders of Allowed Class 2 Claims over the period of five (5) years during which such distributions must be made pursuant to Article 4.2 of the Plan; (ii) Majestic's ability to fully pay the New F&M Bank Note (which shall mature three (3) years after the Effective Date of the Plan) on or prior to the maturity date of the same; (iii) Majestic's ability to obtain replacement financing for the F&M Bank Exit Facility on or prior to the maturity date of the New F&M Bank Note; and (iv) Majestic's ability to make the final distribution on account of all Allowed Class 2 Claims (which final distribution shall be in the approximate amount of $3 million) when due in August, 2016.

any, recovery would be obtained by holders of Unsecured (General) Claims. The Plan, on the other hand, provides for full payment of all Unsecured (General) Claims against the Individual Debtors.

## C.     Alternatives if the Plan is Not Confirmed

If the Plan is not confirmed, the Debtors or any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan or plans of reorganization. Such plans might involve either a reorganization and continuation of the Debtors' businesses, a sale of the Debtors' businesses as going concerns, an orderly liquidation of the Debtors' assets, or a combination thereof. Further, if no plan of reorganization can be confirmed, the Chapter 11 Cases may be converted to a liquidation proceeding under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtors. The proceeds of the liquidation would be distributed to the creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code.

## XII. CONCLUSION

The Debtors urge holders of Claims in impaired Classes to vote to **ACCEPT** the Plan and to evidence such acceptance by returning their ballots so that they will be received on or before 5:00 p.m., Central Time, on ▓▓▓▓▓▓▓▓▓▓, 2010.

[The remainder of this page has been left intentionally blank]

Dated: November 30, 2010.

Respectfully submitted,

**MAJESTIC LIQUOR STORES, INC.**

By:    /s/ John M. Bratton
        John M. Bratton, Vice President


**MAJESTIC TEXAS PROPERTIES, L.P.**

By:    /s/ John M. Bratton
        John M. Bratton, Manager of
        Majestic GP, LLC, Its General Partner


**MAJESTIC TEXAS-GRAPEVINE, L.P.**

By:    /s/ John M. Bratton
        John M. Bratton, Manager of
        Majestic GP II, LLC, Its General Partner


**MAJESTIC GP, LLC**

By:    /s/ John M. Bratton
        John M. Bratton, Manager and Member


**MAJESTIC GP II, LLC**

By:    /s/ John M. Bratton
        John M. Bratton, Manager and Member


        /s/ John M. Bratton
        John M. Bratton, Individually


        /s/ Kyle Tate Fair
        Kyle Tate Fair, Individually


        /s/ Suzanne Patricia Fair
        Suzanne Patricia Fair, Individually

APPROVED:

/s/ J. Robert Forshey
J. Robert Forshey
State Bar No. 07264200
Jeff P. Prostok
State Bar No. 16352500
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
bforshey@forsheyprostok.com
jprostok@forsheyprostok.com

ATTORNEYS FOR MAJESTIC LIQUOR STORES, INC.,
MAJESTIC TEXAS- GRAPEVINE, L.P.,
AND MAJESTIC GP II, LLC,
DEBTORS AND DEBTORS IN POSSESSION

AND

/s/ Joseph F. Postnikoff
Joseph F. Postnikoff
State Bar No. 16168320
GOODRICH POSTNIKOFF & ALBERTSON, LLP
777 Main St., Suite 1360
Fort Worth, TX 76102
Telephone: (817) 335-9400
Facsimile: (817) 335-9411
jpostnikoff@gaplaw.com

ATTORNEYS FOR MAJESTIC TEXAS
PROPERTIES, L.P. AND MAJESTIC GP, LLC,
DEBTORS AND DEBTORS IN POSSESSION

AND

/s/ John Y. Bonds, III
John Y. Bonds, III
State Bar No. 02589100
SHANNON, GRACEY, RATLIFF & MILLER, LLP
777 Main St., Suite 3800
Fort Worth, TX 76102
Telephone: (817) 336-9333
Facsimile: (817) 336-3735
jbonds@shannongracey.com

ATTORNEYS FOR JOHN MELVIN BRATTON,
KYLE TATE FAIR AND SUZANNE PATRICIA FAIR,
DEBTORS AND DEBTORS IN POSSESSION

L:\BFORSHEY\Majestic Liquor #5363\Plan and Disclosure Statement\Second Amended Disclosure Statement 11.30.10.doc